1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    22-CR-458(LDH)

            Plaintiff ,      :
                                  United States Courthouse
      -against-              :    Brooklyn, New York

JUNJIE MIAO,                 :
                                  April 4, 2024
            Defendant.       :    12:25 p.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          BREON PEACE
                             United States Attorney
                             BY: MIRANDA GONZALEZ,
                                 RAFFAELA BELIZAIRE,
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, NY 11201


For the Defendant:           MURRAY E. SINGER, ESQ.
                             14 Vanderventer Avenue, Suite 147
              `              Port Washington, NY 11050


Court Reporter:              Andronikh M. Barna
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

THE COURTROOM DEPUTY:  Good afternoon.

This is a criminal cause for a detention hearing in the matter of U.S.A. versus Junjie Miao, Docket No. 22-CR-458.

The Mandarin interpreter has been previously sworn.

Can counsel please state their appearance for the record, starting with the Government.

MS. GONZALEZ:  Good afternoon, Your Honor.

For the Government, Miranda Gonzalez.

THE COURT:  Good afternoon.

MR. SINGER:  For Mr. Miao, Murray Singer.

Good afternoon, Judge.

THE COURT:  Good afternoon.

Mr. Miao is present.

You all can be seated.

All right, folks.

Now, on March 15th I held a hearing concerning the Court's remand of the Defendant in this case and I made certain findings on the record at that time and ultimately determined that the Defendant in this case posed a flight risk and that the remand that I had previously ordered should continue.  However, in recognition of the fact that Mr. Singer had only recently been assigned as counsel for the Defendant in this case, I agreed to give Mr. Singer an opportunity to argue further concerning the Defendant's violations which provided the bases, the large bases for the Court's concerns.

Proceedings                    3

So, I will hear from you, Mr. Singer.

MR. SINGER:  I come today with a tall task.

THE COURT:  I am glad we all understand before you start.

MR. SINGER:  No, I understand.  I understand the Judge's concerns and yet I am forging ahead because my understanding of some of the -- certainly some of the I think more significant issues related to the phone or the computer are not as clear-cut as they seem to be.

I anticipate that Pretrial is coming.

THE COURT:  Yes.  Where are they?

MR. MURRAY:  I had a conversation with --

THE COURT:  I'm sorry.  You are right.

Where are they?

MS. GONZALEZ:  Your Honor, I spoke with Pretrial --

MR. SINGER:  It's scheduled for 12:30.

MS. GONZALEZ:  -- this morning.

MR. SINGER:  It's a little early.  We started a little early.

THE COURT:  We are?

MR. SINGER:  I know you want to get out.  That's okay.

THE COURT:  Oh.

MS. GONZALEZ:  I understand that both the Pretrial Services officer and both the supervisor were going

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                4

to come to the conference.  I just let them know that we had started early.

THE COURT:  Yes.  This was on us.  I don't think I appreciated we were starting early.

MR. SINGER:  We're all here and we're ready.  I get it.

(Ms. Belizaire enters the courtroom.)

THE COURT:  Oh, there they go.  Okay.

My fault.

MR. MURRAY:  Oh, no.  This is --

MS. GONZALEZ:  No.  That's Ms. Belizaire and my colleague.

MR. MURRAY:  -- Ms. Belizaire.

THE COURT:  But still my fault.

MS. BELIZAIRE:  That's okay, Your Honor.

THE COURT:  Okay.  No, because she's rushing in.

It's okay.  We started early.  Not your fault.

Okay.  All right.  But we're going to continue with Mr. Singer and then hopefully if we need to catch up, Pretrial Services.  Okay.

MR. SINGER:  I had a -- I have been trying to understand the status of the monitoring equipment on the -- on Mr. Miao's iPhone and on his computer.  And some of the information that Your Honor had the last time we were here, I was hearing for the first time.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

THE COURT:  Yes.

MR. SINGER:  Which is why I ultimately asked for some additional time.

You know, I may need to repeat this again with the Pretrial Services officer.

THE COURT:  See?

MR. SINGER:  I am just wondering whether we should wait.

THE COURT:  I told you we could wait a couple of minutes.

MR. SINGER:  Yes, we should wait a couple minutes.

THE COURT:  All right.  Have a seat.

MR. SINGER:  We should wait a couple minutes.

Ms. Quijije was wonderful.  I sat down with her.  We had a long conversation about how these things operate and whatever, and so I don't want to misrepresent --

THE COURT:  Misstate it.

MR. SINGER:  -- or misstate anything.

THE COURT:  All right.  It's only a couple of minutes.  I'm certain that she is on her way up.

(Pause in proceedings.)

(Pretrial officer enters the courtroom.)

MS. GONZALEZ:  We're just waiting on the supervisor.

(Pause in proceedings.)

MS. GONZALEZ:  Your Honor, Pretrial Services is

Proceedings                                    6

here.  When the Court is ready.

THE COURT:  Yes.  Sorry.

All right.  Sorry we started early.  That was my fault.

All right.  So can you just state your appearance for the record, please.

MS. QUIJIJE:  Jeannine Quijije, Pretrial Services.

THE COURT:  All right.  Good.

All right.  Mr. Singer, you were about to address -- I think what you wanted to address was the issue with respect to the bypassing of the cyber monitoring software that had been previously installed on the Defendant's phone.

MR. SINGER:  Yes.  There's a number of moving parts on this, so I just ask the Court to bear with me.  I want to cover a variety of things.

Ms. Quijije was -- I pronounced that correct, right?

MS. QUIJIJE:  Yes.

MR. SINGER:  I'm scared every time I say it.  I'm sorry.

Was kind enough to sit down with me and we had a nice long talk about the -- to understand the monitoring of the phone and the computer.

My understanding -- and I'll be corrected at any stage if I get this wrong -- when Mr. Miao ultimately brought his phone in -- and I understand there were delays in getting

that in and I don't have a response to that.  I understand --

THE COURT:  I just have to be clear.  I don't view it as a delay.  I view it as him being obstructionist with respect to the ability for Pretrial Services to review the phone.  But we don't need to quibble over that.

MR. SINGER:  Yeah, that's I guess getting into his head as to whether he knew or -- whether he had done anything to make the software not work.

THE COURT:  No, no, no, no, no, no, no.  We don't need to quibble over it because I've already decided that it wasn't a mere delay but rather him being obstructionist.  I should have said it differently.

MR. SINGER:  All right.  Okay.  I am not sure that that conclusion is clear, but you --

THE COURT:  I've cleared it up.

MR. SINGER:  You cleared it up.  Okay.

The software was -- cannot, as I understand it, cannot be deleted from the phone.  It clearly was not working because it was not sending data.  It sends data in realtime.  This is an app that's put on the phone by the outside vendor.  The outside vendor, as well as Pretrial, are able to monitor the phone in realtime.  It's sending data in realtime continuously.

THE COURT:  My understanding, just so that I'm clear, my understanding is that it was clarified at the last

hearing that it wasn't that the software had been deleted from the phone but that the Defendant had bypassed the software.

Am I mistaken?

MR. SINGER:  I'm not sure that it's clear that he bypassed it.

MS. QUIJIJE:  Yes, Your Honor.  The issue is it wasn't reporting the data.  So when we found out that it wasn't reporting the data, we checked the data, we contacted him.  So is he -- is that considered bypassing?  We're unsure.  Because we didn't get the opportunity to inspect the phone at that time when it occurred.

A couple of weeks later, about two weeks later is when we actually received the phone and we discovered what we discussed in the last hearing.

THE COURT:  Is there any reason to believe that the software was somehow defective and therefore, as a result, not reporting the data?

MS. QUIJIJE:  No.  The vendor would reach out to us if it was.

THE COURT:  Did the vendor reach out to you?

MS. QUIJIJE:  No, no.

So for all intents and purposes, if we don't hear from the vendor for -- and usually they'll send us an e-mail. They'll send a global e-mail.  Something whether there is a software issue, whether there is an update on the iOS side or

Proceedings                                          9

something that could potentially interfere, they will let us know.

THE COURT:  And so the vendor has not identified for you, consistent with their practices, any issues with the software or updates, et cetera?

MS. QUIJIJE:  Correct.

THE COURT:  All right.

Go ahead, Mr. Singer.

MR. SINGER:  My understanding is that it is possible that this software was not functioning as it should have. Either one possibility is because the iOS software in an iPhone, Apple products work very hard to prevent viruses and other kind of intrusions and may have interfered with the operation of the software.  Pretrial generally doesn't like to have these things on iPhones.

THE COURT:  But you could appreciate that had the Defendant in this case responded to Pretrial Services's request to bring the phone in immediately, that I might be more inclined to believe that, in fact, the issue resided with the software company.

Also, of course, if they had indicated that there was an issue with the software, but you know.

MR. SINGER:  And I think there is also a possibility that the onion browser, which was downloaded onto the phone, because it has higher levels of security could also have

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                      10

somehow impacted the monitoring software that was put on the phone.

THE COURT:  What is your basis for that assertion?

Forgive me, you don't strike me as a techie.

MR. SINGER:  That's fair.

THE COURT:  I am not either.  It just sounds like pure speculation.

MR. SINGER:  Well, again, I'm not intending to -- I mean, it came out of my conversation with Pretrial Services that that is a possibility as well.

I think what we are assuming, that if we assume that Mr. Miao did something to disable the software, his failure to come in right away, it would be a reasonable conclusion that he didn't come in right away because he was trying to obstruct the finding of that information --

THE COURT:  Hold on, Mr. Singer.

I am approaching it differently, right?

I am approaching it saying there was the failure first.  The efforts to avoid coming in, that is what I am looking at first.

And then I say, oh, and now we have this issue where the onion, we discover that the onion browser was deleted. And that, of course, we already knew that it wasn't reporting.

Again, if he had come, if he had been willing to come in, I don't think that we would have had the same

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                      11

concerns.

And it is not simply about the bypassing of the software or the nonreporting information.  We have that along with the onion and we have also the other searches that were being conducted on the phone with respect to the identification, the cryptocurrency, the potential purchase of an airplane.

You know, so you start to add all of these pieces together and it is the totality of the circumstances that led to the Court's conclusion.

So, you know, maybe you potentially undermine the question of whether he intentionally bypassed that software, but that wasn't the only basis for my determination.

MR. SINGER:  I know.

THE COURT:  There are a number of pieces here.

MR. SINGER:  I can only address them one by one, Judge.

THE COURT:  Okay.

MR. SINGER:  I'm trying to do them one by one.

THE COURT:  All right.  Let's go to the next one.

MR. SINGER:  I understand that there are more.

THE COURT:  Yes.

MR. SINGER:  But what I am suggesting with regard to the software on the phone, it's not something that he has the ability to delete from the phone.

Proceedings                                    12

THE COURT:  And that part I appreciate.

MR. SINGER:  And it started with the fact that the phone was not reporting data.  That's what led to them calling him in.

Now, if he knew that he had done something to bypass the phone, then his failure to come in is --

THE COURT:  I don't know what he knew, but that's why -- you know what, this is the thing.  I don't know what the Defendant knew.  But that is why, when we give directions to him to do something, he should simply do it.  If he had simply done what he was asked to do, then the question that you're posing about whether he knew or didn't know wouldn't come up.  He doesn't get to decide selectively whether he is going to abide by the directions of the Pretrial Services based on whether he believes he's done something problematic.  It doesn't work that way.  That would be the tail wagging the dog.

MR. SINGER:  I understand that.

THE COURT:  Okay.

MR. SINGER:  I mean, what I am hearing as well, and I think the overarching concern is whether he's either a danger to the community --

THE COURT:  No.  He's a risk.

MR. SINGER:  -- or a risk of flight.

And all of these things added together, and maybe

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    13

it's just me, it doesn't -- it doesn't strike me as a risk of flight.  He's had a long time to flee and he's made no effort to do so.

THE COURT:  I don't know if he's made no effort.  It looks to me --

MR. SINGER:  He's still here.

THE COURT:  Stop it.  Stop.

First of all, he is in custody.  That man -- I mean, unless he could do the great escape, yes.

But perhaps what I am seeing are the breadcrumbs of the plan.

What you're saying is the only way for me to be able to determine that there is a risk of flight is if, in fact, he already engaged in the flight, because you said he's still here.  That's not the inquiry.

The inquiry is whether I believe there is a risk of flight.  And what I have is this man who is doing searches on the -- okay, I went through all of it at the last hearing.

So in my mind's eye --

MR. SINGER:  Can I address this?

THE COURT:  -- there is a risk of flight.

MR. SINGER:  Can I --

THE COURT:  And --

MR. SINGER:  I am trying to address some of this, Judge.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                            14

THE COURT:  And I have the sureties situation.

I have suretors here; one, the business partner took his name off, as I understand it, and the other ones who keep going up and down about whether or not they want to.  You know, one week they want to be suretors, the next week they don't.

There is a problem with a lot here.

MR. SINGER:  Well, I think that's part two of this. If you're -- if you would consider granting a bond, then that can be addressed.

THE COURT:  You haven't gotten me there yet.

But go ahead.

MR. SINGER:  I understand.  But that can be addressed when we get --

THE COURT:  If we get there.

MR. SINGER:  If and when we get to that --

THE COURT:  Okay.

MR. SINGER:  -- we can address those concerns with each one of the suretors who is willing to sign on.

If we view all of these other actions, identifications or cryptocurrency or looking for an airplane, it doesn't make sense as a way of trying to flee.  You don't need that much.

THE COURT:  Okay.

MR. SINGER:  I mean, if -- I mean, you're gonna

Andronikh M. Barna, Official Court Reporter, RPR, CRR

spend a million dollars on a plane when you could spend $15,000 on NetJets and get on a private plane and leave the country.

THE COURT:  I don't need to get into his mind that way.  You're misapprehending the standard.  Just because the way in which he proceeds doesn't make sense, doesn't mean that it's not evidence in my mind of a risk of flight.

I mean...

MR. SINGER:  I mean, I think it is because it doesn't logically lead to that.

THE COURT:  There is a lot of things that the Defendant in this case says that logically doesn't follow for me.  So again, when you're talking about this particular defendant, I don't know if the notion that it doesn't logically make sense holds much water.

I mean, look, you haven't been around for a long time.  Read the transcripts of the things that have been said by your client.  Again, logic does not necessarily attach to much of it.

MR. SINGER:  And my understanding is that part of that, and this was going to play into another step in my discussion with the Court today, it had to do with his mental state as he's been under the home confinement.  It's been extremely difficult.  He has prepared for me today, you know, two letters, one addressing an apology to the Court for his

Proceedings                                              16

conduct and another piece dealing with his experience over the last several weeks at MDC, which has been god-awful and mind-opening for him in terms of what he's facing.

Your Honor is certainly aware of the difficulties at MDC.  He's went in when a new set of severe and strict lockdowns were going on, so he has never even had the opportunity to get commissary.  And he's living with very little because he hasn't even been able to buy some, you know, basic supplies for him to live on.  It's been god-awful in terms of food and water and any supplies, I mean basic personal hygiene supplies.  It's been awful and it's affecting him.  And he's -- you know, I mean, I understand it's part of incarceration, but it's been rather eye-opening for him, that as well.

If there are stricter conditions that can be imposed, he is willing to abide by them.

I mean, I'm not sure what I can do --

THE COURT:  But his willingness to abide by the conditions of this Court, I mean, he's had several opportunities to abide by the conditions.  And so I don't -- I'm not clear about where we are.

Are you telling me:  Oh, okay, now he's willing to abide by your conditions?

He's had many opportunities.  And it strikes me that on March 7th, I spent so much time with -- I don't know if you

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                                17

were there that day.

MR. SINGER:  I was not.  I came in on the eighth.

THE COURT:  I spent so much time talking with this defendant about what his obligations were, what the Court expected him to do, and this is after multiple violations and his refusal to abide by the instructions of Pretrial Services.

Typically, once I get involved and I say you've got to do something, it usually fixes things.  It did not.  Immediately, this defendant made it abundantly clear to me that not even this court can get him to do what it is that we have set forth as his obligations under the conditions.  And so, I'm not certain if this defendant believes that now he can stand before me and through you say, okay, now I'm willing to do it.  Nothing has changed.

MR. SINGER:  Well, I think something rather significant has changed.

THE COURT:  Hmm.

MR. SINGER:  Being incarcerated for a month changes people, changes this young man who has never been in this kind of situation before.  He is a young man.  He is in his twenties.  I know when I was 24 or 25 I thought I knew everything.  I know much better now.  But he's a young man.  And he is in an unfamiliar situation and he's screwed up over and over again.

THE COURT:  And over find over and over.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    18

MR. SINGER:  I understand.  There's no doubt about that.

It's just, my argument to the Court is that it is not crystal-clear -- it doesn't need to be, I know -- but it's not crystal-clear that he was trying to undo these things with the phone.

His computer, it came in late.  He didn't do any of it the way he was supposed to, but he ultimately brought his computer in on March 8th.  And Pretrial Services has it and they've had a chance to review it and everything on the computer is working fine.

My understanding is that the monitoring software has continued to work fine on -- you know, there wasn't any problems with the operation of that monitoring software on his computer.

THE COURT:  I know.  I don't have any evidence that there were any issues with the monitoring software.  That's kind of my point.  There is no evidence that there was a problem with the application.  There is no notification from the --

MR. SINGER:  No, no, from the computer.

The phone was not -- it was the phone that had the onion browser that was downloaded.

THE COURT:  Mm-hm.

MR. SINGER:  It was the phone that was not reporting

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                                    19

the data that they wanted to see.

But there were also -- they also had software on his computer and there was no issue with the computer.  The computer continued to operate -- or the software, the monitoring software on the computer continued to operate as it was supposed to.

THE COURT:  Yes, I just want to be clear.  And somebody can correct me if my memory is failing me.  This question of revocation of bond for this particular defendant, this is not new.  This is somewhat of a déjà vu or Groundhog Day, is it not, with respect to Judge Reyes?  Judge Reyes has already -- am I mistaken -- gave him an opportunity. He had an opportunity.

MR. SINGER:  That was last August.

THE COURT:  In August of 2023.

MR. SINGER:  Yes.

THE COURT:  And I'm pretty sure Judge Reyes said: Understand this, sir.  It happens again and you will be remanded into custody.

And I gave him yet another opportunity.  And so I'm sorry if I don't see a sufficient difference.

And there is nothing that you have told me that suggests to me that my conclusions are misguided.  Unless you really have something major to say, we've kind of been on this hamster wheel for about 25 minutes.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                           20

MR. SINGER:  I don't have anything major to add to it.

Again, I guess it's conclusions that are reached from what we know and what's before us.  And, you know, as I've dug into --

THE COURT:  Right.

MR. SINGER:  -- you know, the monitoring software, which seemed to be not the only but certainly one of the biggest issues --

THE COURT:  It was.  But this is again viewed -- this doesn't start March 7th of 2024.  This starts way back into the fall/late summer of 2023.  And again, this defendant was before my colleague then-Magistrate Judge Reyes now-District Court Judge Reyes.  He was given an ample opportunity to abide by the conditions of his release.  The Court attempted to address some of the issues by modifying the terms and the conditions of his release in August.  That was unsuccessful in terms of reining in this defendant's conduct.

I am satisfied that the conclusions that I reached on March 15th which are, in effect, consistent with the conclusions that Judge Reyes reached in August of 2023, notwithstanding what I believe was a somewhat generous opportunity provided to him by Judge Reyes, I believe that remand remains appropriate.

Is there anything that you all wanted to add?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

MS. GONZALEZ:  No, Your Honor.  I think that the Court really nailed it all.  And I would, you know, just say that we can't think of any conditions that could be imposed here that would stop -- that would assure that the Defendant wouldn't flee.  So for all the reasons the Court said, we agree that the Defendant should be remanded.

THE COURT:  That ultimate point I agree with as well and should have made that plain.

All right.  Where are we otherwise though in this case?

MS. GONZALEZ:  One moment, Your Honor.

THE COURT:  Do we have a status conference set?

MS. GONZALEZ:  Yes, we do, Your Honor.  I'm just familiarizing myself with the date.

The next status conference in this case is on May 8th.

THE COURT:  Okay.

And time has been excluded until then, right?

MS. GONZALEZ:  Yes, Your Honor.

THE COURT:  All right.

Mr. Singer, do you have anything else for the Court?

MR. SINGER:  No, Judge.

May 8th at -- is that 2:00 p.m.?

MS. GONZALEZ:  It's on the docket.  But yes, it is at 2:00 p.m.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                              22

THE COURT:  All right.

MR. SINGER:  I anticipate that I will be here.  I have a sentencing in Central Islip at 11:00 a.m. that morning.

THE COURT:  Oh.  You won't be here.

I don't know.  How long does it take to get from Central Islip to here?

MR. SINGER:  Well, it depends.

THE COURT:  But, I mean, my sentencings, I know I have a reputation for really long sentencings.

MR. SINGER:  If I'm not --

THE COURT:  Somebody can stand in for you.

MR. SINGER:  I will line up somebody else.

THE COURT:  That's all that needs to be done.

MR. SINGER:  Who can stand in for me.

But I just wanted to let you know this was picked before I got --

THE COURT:  No, it's fine.  You have to balance many obligations.  You can have somebody stand in for you.  I don't think that this is going to be a monumental status conference.

MS. GONZALEZ:  No, I don't believe so, Your Honor. I think it's going to be an update really on plea negotiations, which have been ongoing.

THE COURT:  All right.  Thank you all.

Oh.

MR. SINGER:  I'm continuing to, both with

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                                                  23

Mr. MacDonald, who has provided some information to me already, and I've also provided a hard drive to the Government to provide me a full copy of the discovery so that I can get into the guts of the case now that this matter is put to rest.

THE COURT:  And the Court much appreciates that.

Thank you.

MR. SINGER:  Thank you.

(Matter concluded.)

                    *      *      *      *      *


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


    /s/ Andronikh M. Barna          August 15, 2024
    _____        _____
    ANDRONIKH M. BARNA               DATE


Andronikh M. Barna, Official Court Reporter, RPR, CRR