**ABRAMSON & MORAK**
ATTORNEYS AT LAW
75 MAIDEN LANE, SUITE 607
NEW YORK, NEW YORK 10038
www.abramsonmorak.com

ALAN M. ABRAMSON*
GLENN H. MORAK
MICHAEL MARINO

(212) 226-7098
FAX (212) 226-4559

*MEMBER OF NEW YORK AND CONNECTICUT BARS

August 7, 2025

By ECF

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Cunzhong Liu
Docket No.: 22-CR-458 (LDH)

Dear Judge DeArcy Hall:

    We represent Cunzhong Liu who entered a plea of guilty to Count 11 of the Indictment, Money Laundering Conspiracy, 18 U.S.C. 1956(h) on March 22, 2024, before Magistrate Judge Sanket J. Bulsara. Additionally, Mr. Liu stipulated in the plea agreement with the Government that he participated in the operation of an unlicensed money transmitting business. On October 31, 2024, Your Honor entered an order accepting Mr. Liu's guilty plea. Sentencing is now scheduled by Your Honor for September 9, 2025, at 11:00 AM. We respectfully request this Court consider the following circumstances in determining a just and fair sentence for Mr. Liu.

    The parties have stipulated that the offense conduct yields an adjusted advisory guideline level of 19. The Pre-Sentence Investigation Report (PSR), however, calculates Mr. Liu's adjusted advisory guideline at Level of 22. The Government and the defense have previously filed objections to the PSR's calculation. We will discuss in greater detail, *infra*, why the correct guideline calculation is 19. We note that the Government and Probation agree that Mr. Liu is entitled to a three-point reduction for his acceptance of responsibility for his criminal conduct in a timely fashion.

    Mr. Liu has no criminal history points and is assigned to Criminal History Category I and is accordingly entitled the two-point adjustment as a zero-point offender. The Government and Probation agree that Mr. Liu is entitled to a two-point reduction from the guidelines as a minor offender. The defense and the Government therefore believe the correct interpretation of the

1

advisory guidelines is level 19, which yields an advisory range of 30-37 months.

The defense respectfully submits that the Court should impose a sentence below the advisory guideline range based on the factors to be considered in imposing a sentence pursuant to 18 U.S.C. 3553(a). We respectfully submit that a non-custodial, non-guideline sentence of time served, restrictive conditions while on supervised release and mandated inpatient treatment in a drug program would have a sufficiently deterrent effect.

### SENTENCING AFTER UNITED STATES V. BOOKER

As this Court is fully aware, the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), substantially altered a Court's obligation with respect to sentencing. We recognize Your Honor must begin the sentencing hearing by calculating the sentencing guidelines as an initial starting point. Gall v. United States, 552 U.S. 38 (2007). Nevertheless, the sentencing court should consider all the factors in determining an appropriate individualized sentence for the defendant. 18 U.S.C. 3553(a) requires the sentencing court to consider seven factors in the sentencing process. A court should consider the factors in section 3553(a) to impose a sentence "sufficient but not greater than necessary" as required in accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Section 3553(a)(1) requires the sentence imposed to consider both the nature and circumstance of the offense and the history and characteristics of the defendant, while section 3553(a)(2)(a) demands that the penalty provides just punishment for the offense that simultaneously affords adequate deterrence to criminal conduct as required by section 3553. As the United States Supreme Court has discussed, while the guidelines must be considered, the sentencing court is under no obligation to sentence a defendant under the presumption that the guidelines range is reasonable. Nelson v. United States, 555 U.S. 350 (2009). Further, as one district Judge noted, "the guidelines may be tempered by compassion." United States v. Kloda, 133 F. Supp 2d. 345, 349 (S.D.N.Y. 2001).

As the Supreme Court stated over 25 years ago, the "uniform and constant…tradition for the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensure." Koon v. United States, 518 U.S. 81, 113 (1996). See also, United States v. Jones, 531 F.3d 163, 182 (2d Cir. 2008). It has been observed that sentencing is not an exact science, rather it is a "fluid and dynamic process." Irizarry v. United States, 553 U.S. 708 (2008). Its aim should be to impose a sentence that is reasonable, fair, and just given the facts of a particular case and the related circumstances of the person being sentenced. The overarching goal is to fashion a sentence that is sufficient, but not greater than necessary.

Mr. Liu was released on bond a few days after his self-surrender on April 7, 2023, with special conditions of location monitoring and home detention. Mr. Liu is 30 years old and has no prior criminal history and is a zero-point offender. Nevertheless, because of his plea for his serious criminal conduct, he is facing an advisory guideline range of 30-37 months under the plea agreement calculation of the advisory guidelines.

It remains our position that a non-guideline, non-custodial sentence of time served, restrictive conditions and mandated inpatient treatment in a drug program would have a sufficiently deterrent effect. The defense would respectfully ask the Court to consider the defendant's acceptance of responsibility, his minor role adjustment in the offense and his sincere remorse for his conduct in concluding that a non-custodial sentence is sufficient but not greater than necessary to ensure a fair and reasonable sentence of Mr. Liu.

### CUNZHONG LIU'S CRIMINAL CONDUCT IS DISTINGUISHABLE FROM MULTIPLE CO-DEFENDANTS WHO PARTICIPATED IN THE CONSPARICIES

As reflected in the PSR, Mr. Liu has neither directly participated in the T5 conspiracy nor participated in the passport fraud conspiracy, nor the aggravated identity theft charges. Mr. Liu fully acknowledges his serious criminal conduct with respect to his role in the money laundering conspiracy and the stipulated conduct in the unlicensed money transmitting business. It must be noted, however, that Mr. Liu at all times was directed by other individuals in the criminal organization. Mr. Liu had no insight into or participation in the decision-making function of the criminal organization and he did not share in the overall profits. He received a fee, based on a percentage of the money the bosses and managers received, for his criminal work and activities. PSR 29. Mr. Liu had an understanding of the scope and structure of the criminal enterprise, and he participated in the scheme through various measures as outlined in the PSR. See, PSR paragraphs 25-50, 59, 62. Mr. Liu therefore is entitled to a minor role adjustment under USSG Section 3B1.2(b). See, PSR 62.

We suggest that Mr. Liu was the functional equivalent of a courier, albeit a useful and necessary participant for the top bosses and managers to conduct the T5 scheme and the unlawful bank transmitting scheme. As an under-educated individual who was willing to play a criminal role in their schemes, Mr. Liu was perfect for their purposes. Mr. Liu was willing to follow orders without questioning their directions and had one reliable skill that he could offer this enterprise: the ability to drive to the different banks to conduct the unlawful bank transmissions and to make transfers to assist the leaders in the money laundering conspiracy. He was an unsophisticated participant, in that he was willing to open bank accounts in his own name, neither using passport fraud nor identity theft to conduct his minor role in the conspiracies. He did participate in at least 40 conversions of bulk cash to checks at multiple banks, converting approximately $9,855,136 from cash into cashier checks. PSR 33. Additionally, Mr. Liu laundered approximately $361,442 in funds derived from a victim of the T5 scheme through shell companies. PSR 46.

Reviewing the offense conduct of co-conspirators who are referenced in the PSR, there are multiple differences in conduct that we would like to highlight. Co-defendant Changgui Huang laundered more than $2.3 million utilizing at least three shell corporations and used a fake passport to do so. PSR 44. Co-conspirator Chen, referenced in PSR 43, laundered over $1.1 million using an alias, operated at least two shell companies and opened bank accounts using a stolen driver's license. Co-conspirator Jin laundered over $1.2 million using an alias, operated at least two shell companies and created bank accounts using a fake Chinese passport. PSR 45. This information is derived from the PSR, and we do not have the specific amounts laundered by other co-conspirators.

Additional there are co-conspirators who oversaw the money laundering of the T5 scheme and served as intermediaries between the T5 account managers and the money launderers. PSR 41. Mr. Liu was not involved in the passport fraud conspiracy or aggravated identity theft.

To be clear, these distinguishing features do not minimize the seriousness of his criminal conduct, and it certainly does not excuse Mr. Liu's actions. Mr. Liu knew he was participating in serious criminal activity. Nevertheless, we argue it is of great importance to recognize that his conduct is distinguishable in part from other co-defendants in this case and the Government, and the Probation Department agree that he had a minor role in these crimes. Mr. Liu fully understands that for his criminal conduct, he must be punished. We would ask, however, that the Court consider his conduct, as compared to other defendants, as one reason to impose a sentence below the advisory Guidelines.

## LEGAL OBJECTION TO THE ADVISORY GUIDELINES CALCULATION IN THE PSR

The PSR calculates the total offense level for Mr. Liu at Level 22. The Government and the defense submit the guideline level must be calculated at Level 19. The Government filed a memorandum of objections to the PSR calculation on November 21, 2024. The defense submitted a memorandum to the probation department (with courtesy copy to Chambers) on November 22, 2024, joining the Government's objections to the guideline calculations. While the Government's filing (ECF 249) addresses this issue in far greater detail, the defense would like to highlight the reasons why the Government's and defense calculation of level 19 is correct and should be adopted by Your Honor.

The Government calculated the guideline ranges for the money laundering conspiracy plea (Count 11) and the stipulated conduct (unlicensed money transmitting business) separately as these were two separate and distinct schemes. Based on the correct grouping analysis, the higher advisory guideline for the stipulated conduct was therefore correctly used as the appropriate guideline calculation. Finally, the adjusted offense level was determined which yielded an advisory guideline range of 19. The PSR however applied a different methodology and combined the money laundering conspiracy with the stipulated conduct and calculated the advisory guideline at Level 22. The Government and defense jointly submit that the PSR formulation is legally incorrect.

The Government, defense and Probation agree that the money laundering conspiracy and unlicensed money transmitting business conduct are distinct criminal schemes. While the plea of guilty to Count 11 and the stipulated conduct are required to be grouped for guideline determination, each scheme's guideline calculation must first be determined separately. Only after doing the initial, separate, and distinct guideline calculation is it legally proper to then conduct the grouping analysis and determine the advisory guideline based on the higher guideline score. Probation incorrectly combined the loss amount for two separate and distinct schemes instead of calculating them independently. This methodology is inconsistent with the advisory guidelines. Accordingly, because Mr. Liu is in criminal history I, the legal guidelines level is level 19, and the advisory guideline range is therefore 30-37 months.

## THE APPLICATION OF THE LOSS GUIDELINES CAUSES THE OFFENSE LEVEL TO OVERSTATE THE SERIOUSNESS OF THE OFFENSE

Because Mr. Liu is responsible for $361,442 in connection with the money laundering conspiracy, 12 points are added to his base offense level under U.S.S.G Section 2B1.1(b)(1)(G). Because he is responsible for $9,855,136 in connection with the unlicensed money transmitting business scheme, 20 points are added to the base offense level under U.S.S.G Section 2B1.1(b)(1)(K). Mr. Liu's advisory guidelines range, as calculated by the Government and the defense is substantially driven by the calculation of the loss amount as required by U.S.S.G. Section 2B1.1(a).

Sentencing judges have discretion to sentence an individual significantly below the applicable guideline range based solely upon policy reasons and their disagreement with the guidelines themselves. Gall v. United States, 552 U.S. 38 (2007). We submit the loss enhancements set forth in the guidelines do not give proper consideration to the Section 3553(a) factors applicable to Mr. Liu, considering his minor role in the conspiracies.

Judges have found the guidelines to be excessive as applied to fraud cases and have relied more upon the individual Section 3553(a) factors to determine an appropriate sentence below the advisory guideline range that is sufficient, but not greater than necessary to comply with the sentencing purposes of punishment, deterrence and rehabilitation. Though the Commission has made the amount of economic loss the determinative factor in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of the seriousness of the offense. The specific loss amount is often "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." United States v. Emmenegger, 329 F. Supp. 2d 416, 427. (S.D.N.Y 2004). We submit the fraud loss rationale is equally applicable to Mr. Liu's criminal conduct in the instant offenses.

Certainly, the loss amount is relevant, however, given the minor role adjustment, the loss amount enhancements overstate the seriousness of his role in the case and need for deterrence. In this case, the advisory guideline range is greater than necessary to satisfy the goals of sentencing and as such we respectfully request that this Court consider Mr. Liu's criminal conduct and role in the schemes and that a non-guideline sentence is warranted.

## HISTORY AND CHARACTERISTICS OF CUNZHONG LIU

While the PSR addresses Mr. Liu's background in greater detail, we would like to highlight certain aspects of his social history for the Court. Mr. Liu, now 30 years old, was born on November 13, 1994, in a village within Fujian, China. Mr. Liu is not an English speaker and communicates with counsel through a Fukienese interpreter. Raised by his parents, his father, aged 64, was a taxi driver and his mother a homemaker. His father has suffered from liver disease. He remains close to his mother, and they enjoy a good relationship. His father, however, had cut off communication with him, and this pains Mr. Liu emotionally. He has been attempting to repair this relationship throughout his pre-trial home detention period.

5

He grew up impoverished, but feels his personal needs were met. He was raised with two siblings, one sister aged 34, who still resides in Fujian, China, and his other sister, 33, lives in Dallas, Texas. His sister in China is married, a teacher, and has no children. His sister in Dallas, Texas, Yanquin Liu, is one of the co-signers of his bond and works in a restaurant. Due to health problems that affected her ability to work, she was unable to continue financially supporting Mr. Liu during his nearly 2-and-a-half-year release on home detention. As Probation notes, while she remains supportive of her brother, their relationship has been strained by his need for financial support. Unfortunately, since his surrender on this indictment in April of 2023, Mr. Liu has been in desperate need of financial support and has received intermittent support from his sister when healthy, and subsequently from other friends. A home visit revealed that he lives in one bedroom of a two-bedroom apartment with a roommate.

Mr. Liu has had one committed relationship in his life. He was in a long-term relationship with Xiaorong Xie from 2013 until 2023. They are separated and not in contact because of the instant case. Of note, Mr. Liu is the father of a young boy who lives in China with the child's maternal grandmother since the child was 4 months old. He has not seen his son since he was relocated to China and has found the separation emotionally difficult. Prior to the offense, he provided financial support for his son, who is now 5 years old. Due to his lack of employment, he has been painfully unable to provide financial support during the pendency of this case.

Mr. Liu attended school, but he received an extremely limited education and dropped out of middle school in China in the 8th grade, stating to Probation that he was uninterested in school. We believe this was related to an inability to learn and a desire to work to help support his family. The only real skill he possesses is that he can drive an automobile. Since coming to the United States, he has held several menial jobs at various locations for short periods of time. He has worked as a delivery courier, a nail technician and as staff in a restaurant. Although he lacks any significant work skills, he does have a work ethic, and it pains him greatly that he cannot even do delivery work to help with his dire financial needs or to provide support for his parents or child.

Mr. Liu came to the United States in 2018. Mr. Liu is clearly facing severe and serious immigration consequences due to his lack of status and because of his arrest and conviction for the present offenses.

Although denying mental health issues, Mr. Liu admits to feeling depressed. Unfortunately, during his period of home detention, he began self-medicating with the use of methamphetamine. Since June 2024, he has repeatedly tested positive for methamphetamines, the last test of which we are presently aware of being late July, 2025.

Immediately upon learning of the initial positive test, we contacted pretrial about getting Mr. Liu into a drug program. Pretrial worked diligently but it took quite some time for them to find a program that was for mandarin speakers. He was placed in Hamilton House on March 21, 2025, and he remains in treatment as of the time of this submission. See, Exhibit A. He continues to receive treatment to address his substance use and mental health concerns. Since he continued

to test positive, pretrial notified the Court on June 30, 2025, that they are actively trying to refer Mr. Liu to an inpatient drug program, which the defense fully supports, where he can receive the more intensive treatment and rehabilitation he obviously needs. While pretrial writes that that he has been forthcoming about his struggles with substance abuse, they have been trying since at least June 30, 2025, to place him inpatient. As of the date of this submission, that has yet to happen, but we are confident that pretrial is diligently attempting to make that necessary referral that Mr. Liu needs. We hope to provide more details to the court about this attempt to place him inpatient at the time of sentencing.

Mr. Liu's depression and substance abuse is in sad contrast to how he has been described in the letters of support that are attached to this submission. See Exhibit B. His cousin Jindong Liu describes him as a kind, diligent individual who prior to his surrender, was committed to his family responsibilities by assisting his mother and father in China financially. Additionally, he was very committed to his young son, financially and emotionally, even though the young boy now resides in China. His cousin further relates that our client has accepted responsibility for his criminal conduct, and he has "deeply recognized his wrongdoing and expresses sincere regret." His roommate for the last year, Wei Chen, has also written a letter of support. He writes that Mr. Liu has used his time under home detention to reflect upon his conduct and has repeatedly expressed remorse, that he believes Mr. Liu's regret is genuine and that Mr. Liu longs for the opportunity to start over and become a better person. Exhibit B.

His sister, Yanquin Liu, has also written a letter of support to Your Honor. She also describes his family responsibilities to his parents, and young child. After Mr. Liu surrendered, his sister became his primary source of financial support. When she needed surgery and was unable to work, she had to stop financially contributing to her brother. This inability to provide support coincides with Mr. Liu's initial violation of conditions on May 2, 2024. On that date, we communicated by email with his then PTO Bianca Carter. She informed us that after receiving notice that he left his residence to be at a Chinese restaurant in his neighborhood, ordering him to return home, he sent her a text, "I have no money and no food to eat." Although he indicated he wanted to work, PTO Carter reminded him that he is not permitted to do so under the terms of his release and that he needed to return home immediately. A Violation Memorandum was sent that day to the Court. Over the next few weeks, we spoke or reached out to PTO Carter asking if there was any assistance they could offer him in obtaining supportive housing or food, as he indicated to us, he was running out of funds to pay rent, obtain food and the ability to borrow funds. Though friends and family helped Mr. Liu financially again, there was an additional violation for leaving his residence on July 10, 2025, during and in violation of his permitted grocery-laundry schedule. He told pretrial services that he went to his friend's residence to borrow money for living expenses.

Based on the positive tests for the use of illegal drugs, inpatient drug treatment, as pretrial recommends, we believe would be extremely beneficial and critical for his successful rehabilitation.

7

## ACCEPTANCE OF RESPONSIBILITY

Mr. Liu has fully accepted responsibility for his conduct. This is evidenced by his plea and attached letter to Your Honor.[1] Exhibit C. Mr. Liu indicates he fully recognizes the mistakes he has made and takes full responsibility for his actions. He writes that his behavior not only violated the law but caused harm to others. He has disappointed his family and himself. While we anticipate he will directly address Your Honor at the sentencing hearing, he would like the Court to be aware that he voluntarily turned himself in to the authorities to demonstrate his willingness to accept judgment and take responsibility for his actions. As stated in Mr. Liu's letter:

> I have learned a valuable lesson from this experience, no matter the circumstances or how much pressure one faces, one must always abide by the law and maintain integrity. I have deeply reflected on my actions and am determined to make a complete change…I once again respectfully ask the court to consider my remorse and the direction of my future efforts and to grant me an opportunity to start over. I will prove my sincere regrets through my actions and will not disappoint the court's forgiveness and trust.

Exhibit C

## SENTENCE REQUEST AND CONCLUSION

Mr. Liu knows he must be punished for his criminal conduct. While the offense is unquestionably serious, we are respectfully requesting Your Honor give full credit for the factors that demonstrate that the community will need no protection from Mr. Liu committing future crimes, as evidenced by his lack of criminal history, his minor role in the conspiracies, his full acceptance of responsibility evidenced by his plea and his letter to Your Honor. He is asking for a second chance to return to his community, make amends and lead a law-abiding life.

We submit that Mr. Liu is truly remorseful for his actions and we respectfully ask the Court to consider all the history and circumstances of Mr. Liu's life, his lack of criminal record and his minor role in the conspiracies in reaching a fair and appropriate sentence. We are respectfully asking Your honor to consider the types of sentences available, and to do so by showing leniency toward Mr. Liu in the Court's exercise of its considerably discretion and sentence Mr. Liu to a non-custodial sentence of time served, 3 years of intensive supervised release, monitoring mandatory intensive inpatient drug treatment and order of forfeiture. We submit that intensive drug treatment is critical to his rehabilitation. Additionally, Mr. Liu will face serious and severe immigration consequence for his criminal conduct. We humbly submit that such a sentence would achieve the sentencing goals of 18 U.S.C. 3553(a) by crafting a sentence that is sufficient but not greater than necessary while concurrently suiting the needs of general and specific deterrence.

---

1 The letter by Mr. Liu attached as Exhibit C was dictated by Mr. Liu through an interpreter.

8

Dated: New York, New York
August 7, 2025

Respectfully submitted,

/s/
_____
Glenn H. Morak

/s/
_____
Alan Abramson

cc: AUSA Weintraub, AUSA Gonzalez, AUSA Beliizaire (via ECF and email)
All Counsel (via ECF)
PO Audain, PO Wing (via email)

9