**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**22-CR-458 (LDH)**
-----------------------------------------------------------------------------------------

**UNITED STATES OF AMERICA,**

**-against-**

**JIAHUI MIAO,**

                    *Defendant.*

**SENTENCING MEMORANDUM**

-----------------------------------------------------------------------------------------

# SENTENCING MEMORANDUM
# ON BEHALF OF JIAHUI MIAO

By:  James Kousouros, Esq.
Law Offices of James Kousouros
*Attorney for Mr. Miao*
260 Madison Avenue, 22nd floor
New York, New York 10016
Tel: (212) 532-1934
Fax: (212) 532-1939
James@kousouroslaw.com

**TABLE OF CONTENTS**

Preliminary Statement ..................................................................................................1

The Offense Conduct and the Sentencing Guidelines ...................................................2

Our Request For a Non-Guidelines Sentence ...............................................................3

    The Loss Guidelines: U.S.S.G. § 2B1.1 ................................................................5

    Personal History and Characteristics of Jiahui Miao .............................................8

    The Conditions of Confinement at the Metropolitan Detention Center ..................12

    18 U.S.C. § 3553(a)(2)(A), (B) and (C): The Need for the Sentence Imposed to Reflect the Purposes of Punishment Contained in the Federal Sentencing Statute......................................16

Conclusion ................................................................................................................17

# **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ....................................................................4

*Koon v. United States*, 518 U.S. 81 (1996) ...............................................................17

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ....................................................4, 5

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ...........................................6

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................3

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ...............................................4

*United States v. Chavez*, No. 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024) ...................13

*United States v. Colucci*, No. 23 Cr. 417 (GRB) (E.D.N.Y. Aug. 5, 2024) ...............13

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................6

*United States v. Day*, No. 19 Cr. 619 (CM) (S.D.N.Y. April 29, 2021) .....................13

*United States v. Faibish*, 12 Cr. 265, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) .....................7

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................7, 8

*United States v. Jimenez-Beltre*, 440 F.3d 514 (1st Cir. 2006) ...................................5

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .....................6

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ...................................................3

*United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020) ...................12

*United States v. Morgan*, No. 19 CR. 209 (RMB) (S.D.N.Y. May 5, 2020) ...............13

*United States v. Musgrave*, 647 F.App'x 529 (6th Cir. 2016) .....................................7

*United States v. Myers*, 353 F. Supp 2d 1026 (U.S. Dist. Ct. S.D. Iowa, Pratt, DJ, 2005) ............5

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) ..................................7

*United States v. Ramos*, 2020 WL 3642050 (S.D.N.Y. July 6, 2020) ..........................12

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ...............................................8

**Statutes**

18 U.S.C. § 1343 .............................................................................................................2

18 U.S.C. § 1956(h) .......................................................................................................2

18 U.S.C. § 1957(a) .......................................................................................................2

18 U.S.C. § 3553 ...........................................................................................................5

18 U.S.C. § 3553(a) ...............................................................................................1, 4, 5

18 U.S.C. § 3661 ...................................................................................................................4

**Regulations**

U.S.S.G. § 2B1.1 ...............................................................................................................3, 5

U.S.S.G. § 2B1.1(b)(1)(H) .................................................................................................3

U.S.S.G. § 2B1.1(b)(1)(I) ..................................................................................................3

## <u>LIST OF EXHIBITS</u>

**Exhibit A:**    Letter to the Court from Jiahui Miao

**Exhibit B:**    Letters in Support of Jiahui Miao

**Exhibit C:**    Certificates Awarded to Jiahui Miao

**Exhibit D:**    Inmate Working Performance Rating

**Exhibit E:**    BOP Psychology Services NRDAP – Administrative Note

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------
UNITED STATES OF AMERICA,


                    -v-                                        22-CR-458 (LDH)



JIAHUI MIAO,

                    Defendant.
------------------------------------------------------

## SENTENCING MEMORANDUM

### *Preliminary Statement*

This memorandum is respectfully submitted on behalf of Jiahui Miao, who is scheduled to be sentenced by the Honorable LaShann DeArcy Hall, United States District Court Judge for the Eastern District of New York on October 10, 2025. For the reasons set forth below, we respectfully request that the Court consider a variance from the sentencing guidelines as sufficient, but not greater than necessary, to satisfy the goals of punishment as delineated in 18 U.S.C. § 3553(a).

Mr. Miao is 27 years old. He was raised in China by his paternal grandparents while his parents worked to support the family. He was a well-behaved child who excelled at school until at the age of ten, when a tragic and transformative event changed his course. On July 5, 2009, violent riots broke out in his hometown of Urumqi. Mr. Miao watched from a fire escape as rioters killed 200 people and injured close to 2,000 others. He witnessed brutal beatings and other extremely violent conduct as the government retaliated against protesters of racism and abuse. As a result of this tragic event, Mr. Miao's attitude and behavior degraded into several years of drinking and drug use. As will be described, *infra*, Mr. Miao began associating with irresponsible friends and family members who introduced him to drugs and alcohol, all of which culminated in his

involvement with the charged conduct in this case. What remains is a repentant young man who while incarcerated has thought long and hard about the direction of his life and the illegitimate conduct to which he applied his intellect and abilities. He fully recognizes his transgressions and is committed to using his abilities in a productive and law-abiding manner.

Mr. Miao fully accepts responsibility for his conduct in this case in which he, along with others, conspired to launder criminally derived funds.[1] Mr. Miao was not involved, nor charged with the underlying fraud but he understands the harm that befell the victims of this offense. He is a bright and capable young man. He now faces certain deportation after having spent a considerable amount of time at the MDC, Brooklyn. He is committed to serving his sentence, rebuilding his life, and applying his skills and intellect to earn a legitimate living.

We respectfully submit that a variance should be considered in this case as Mr. Miao's personal history and characteristics, his incarceration at the MDC and the remaining collateral consequences warrant some variance from the advisory guidelines.

### The Offense Conduct and the Sentencing Guidelines

Mr. Miao pled guilty before Magistrate Judge Vera M. Scanlon to Count Eleven of the Indictment which charged that between May 2021 and August 2022, he, along with others conspired to launder funds with a value greater than $10,000 that were derived from specified criminal activity, wire fraud, in violation of 18 U.S.C. § 1343 and in violation of 18 U.S.C. § 1957(a) and 1956(h). Mr. Miao conducted approximately 13 illicit transactions between January 2021 and May 2021 involving $1,289,147. In specified related conduct relating to unlicensed money transmissions he was involved with approximately $1,295,925. As noted in the Presentence Report, Mr. Miao did not have decision-making authority in the overall criminal organization and

---

[1] Mr. Miao was not charged in Counts One through Seven, Ten, Thirteen and Fourteen.

only received a fee for his involvement as opposed to a share in the overall profits. *See* PSR, page 24, ¶86.

The plea was entered into pursuant to a Plea Agreement with the Government. The Plea Agreement provides for an adjusted offense level of 22 and an advisory sentencing range of 41-51 months. The Presentence Report comports with the Plea Agreement except with regard to the adjustment pursuant to U.S.S.G. § 2B1.1 relating to the funds for which Mr. Miao will be held responsible. Probation combined the value of the laundered funds ($1,289,147) with the funds from the Unlicensed Money Transmitting Business ($1,295,925) and applied a 16-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(I). Based upon the Court's ruling during the sentencing of co-defendant Changgui Huang and consistent with the Plea Agreement, the money laundering conspiracy and unlicensed money transmitting offense are distinct criminal schemes. As such, the guidelines for each must be first calculated prior to the grouping analysis. With this analysis, the enhancement under U.S.S.G. § 2B1.1 is 14-levels with a resultant advisory sentencing range of 41-51 months. We respectfully request that ¶86 of the Presentence Report be amended to reflect that the resultant adjustment pursuant to U.S.S.G. § 2B1.1(b)(1)(H) is 14-levels for a total offense level of 22. With this correction, the applicable adjusted offense level is 22 with an advisory guideline range of 41-51 months.

### Our Request For a Non-Guidelines Sentence

In the aftermath of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, a non-guidelines sentence is clearly within this Court's discretion. This Court has "considerable discretion in identifying the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 168 n.5 (2d Cir. 2008) (Raggi, J.). The sentencing court, after first identifying the applicable guideline range, can impose a non-guidelines sentence upon a finding of "sufficient

justification" for the sentence imposed. *See Gall v. United States*, 552 U.S. 38 (2007). "A sentencing judge has a very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. No limitation is placed upon the information concerning a defendant's background and the conduct in issue that can be considered by the court in making its sentencing determination." *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008). *See also*; 18 U.S.C. § 3661.

These decisions universally embrace the discretion now afforded to district court judges who have "access to, and greater familiarity with, the individual case and the individual defendant" to be sentenced to make the "individualized assessment[s]" so often constrained by the once mandatory guidelines. With this discretion we can trust that "every convicted person be considered as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

Thus, while consideration of the guidelines is in order, the Court must now be guided, in the final analysis, by all of the factors set forth in 18 U.S.C. § 3553(a). These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B)    to afford adequate deterrence to criminal conduct;
>>
>> (C)    to protect the public from further crimes of the defendant; and
>
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

      (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

         …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

In fashioning an appropriate sentence, the overarching mandate of the sentencing court is the "parsimony principle"—to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553. *Pepper v. United States*, at 1243. We respectfully request that the Court consider the arguments set forth herein and consider a variance from the guidelines.

### *The Loss Guidelines: U.S.S.G. § 2B1.1*

Before addressing Mr. Miao's personal history and characteristics, we ask the Court to consider the outsized impact of the loss amount adjustment. The adjustments provided for by U.S.S.G. § 2B1.1 are the single most impactful adjustments in fraud cases and while the resulting offense level may technically fit within the numerically fixed guidelines, they often do not befit the individual to be sentenced. As the First Circuit recognized in *United States v. Jimenez-Beltre*, 440 F.3d 514, 527 (1st Cir. 2006) (Lipez, J. dissenting), the "guidelines are inescapably generalizations" that often say little about the "history and characteristics of the defendant." *See also*, *United States v. Myers*, 353 F. Supp 2d 1026 (U.S. Dist. Ct. S.D. Iowa, Pratt, DJ, 2005).

In recent years, courts have examined whether guideline increases based on loss are unreasonable or penologically counterproductive and have increasingly embraced the opportunity

to correct any injustice precipitated by this adjustment. The loss table, "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

Given the flawed policies behind the Loss Table, it is not surprising that there is a "widespread perception that [§ 2B1.1] is broken[,] leav[ing] district judges without meaningful guidance in high-loss cases." *Corsey*, 723 F.3d at 378; *see also* Barry Bross & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save it*, 18 Ohio St. J. Crim. L. 605, 619 (2021) ("[A] broad judicial consensus has developed that Section 2B1.1's loss table overstates culpability in a great many cases."). *See also* Mark W. Bennett, Justin D. Levinson, Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 958, 983 (2017) ("Especially as the loss amount increases into the millions, the sentences recommended by the loss table are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes.").

In 2018, E.D.N.Y. District Judge Nicholas G. Garaufis added his "name to th[e] lengthy list of judges, practitioners, scholars, and other commentators" who "have urged the Sentencing Commission to right th[e] grievous wrong [of the Loss Table]." *United States v. Johnson*, 2018 WL 1997975, at 4 (E.D.N.Y. Apr. 27, 2018). Judge Garaufis found it "particularly galling that [loss] is often more or less *solely* responsible for a white-collar offender's Guidelines sentence" when the "loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *Id.* at 3. Although the applicable Guidelines range in Judge Garaufis's case was 87–108 months'

imprisonment, he "refuse[d] to mechanistically impose such an illogical sentence" based on the Loss Table and instead imposed a 24-month prison sentence. *Id.*; *see also, e.g.*, *United States v. Musgrave*, 647 F.App'x 529, 538 (6th Cir. 2016); *United States v. Faibish*, 12 Cr. 265, 2015 WL 4637013, at *2–3 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (criticizing the Loss Table as "a black stain on common sense"). In *United States v. Gupta*, 904 F. Supp. 2d 349, 350–51 (S.D.N.Y. 2012) (Rakoff, J.) Judge Rakoff described the disconnect between the fraud guidelines and the other salient yet under-emphasized factors necessary for sentencing purposes:

> The notion that [the imposition of a sentence on a fellow human being] can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.… The Guidelines' calculations for this [securities fraud] offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.… By making a Guidelines sentence turn, for all practical purposes, on [the amount of loss], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.

*Id.*

We fully recognize the seriousness of the offense conduct in this case and the harm to the victims. Mr. Miao accepts responsibility for all of his conduct and fully accepts that a term of incarceration will ensue along with the collateral consequences of his conviction. While the loss amount in any case and the impact on victims is clearly relevant, we respectfully request that the Court consider the above in determining the appropriate sentence to be imposed and to give greater weight to Mr. Miao's personal history and circumstances as they better define the man who will stand before this Court for sentencing.

**Personal History and Characteristics of Jiahui Miao**

"*Booker* breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc), *see also United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012). Human beings are complicated and Mr. Miao is no exception. It is for this reason that the factors set forth in 18 U.S.C. § 3553(a) require a full understanding of the individual while also considering the facts surrounding the offense conduct. While we will briefly detail Mr. Miao's personal history below, submitted herewith as Ex. A, is a letter narrative from Mr. Miao in which he has detailed his life history and remorse for his conduct. Two conflicting narratives emerge in his letter. The first is that of a bright, capable and generous young man who has benefitted from his education—both from school when he attended properly and from his own self learning—and the second is a young man who was critically scarred from witnessing a horrific event at the age of ten which negatively shaped his childhood, teenage years and young adulthood.

Jiahui Miao is 27 years of age and was born in China. His parents reside in China and remain supportive of him. He was raised primarily by his paternal grandmother and paternal great grandmother as his parents worked long hours. Mr. Miao excelled in school as a child until the age of ten. It was at this time that Mr. Miao witnessed a series of riots that broke out in Urumqi, China in protest against racism and mistreatment. The riots lasted several days. It began as a protest but escalated into violent attacks targeting the Han people.[2] Media reports indicate that 197 people died and 1,721 were injured. Mr. Miao witnessed an assault on a pregnant woman and the violent assaults of others. He was ten years old. This was a transformative event for him. He lived in fear

---

[2] *See* Wikipedia, *July 2009 Ürümqi riots* available at:
https://en.wikipedia.org/wiki/July_2009_%C3%9Cr%C3%BCmqi_riots

and experienced nightmares for months. He tattooed his name on his ankle to provide identification of his body in the event he was killed. He left home with "friends" but returned a month later. His own uncle began taking him out to clubs and encouraged him to imbibe alcohol at the age of thirteen. It was during this time that Mr. Miao was introduced to methamphetamine, a drug he would begin using and abusing in the ensuing years. He continued to associate with a negative crowd, continued his alcohol and drug use, and largely ignored the studies that he had previously been committed to. At the same time, he dreamed of being a successful business person and looked for ways to make money.

Concerned for his son, Mr. Miao's father sent him to school in Australia. While he was separated from the bad influences in China, and respectful to his host family, Mr. Miao's drug and alcohol abuse continued. He later came to the United States to attend Washington Academy in Maine. While Mr. Miao attended to his studies and started an e-commerce business, he was still unsettled and later transferred to Windsor High School in Flushing, Queens. Here as well he earned good grades but his drug use continued. After graduating from high school, Mr. Miao enrolled in business courses at a local college. He moved to Long Island City and began working in the car business.

When the COVID-19 pandemic struck, Mr. Miao sent face masks to his family in China and used his earnings to donate masks to those in need. He moved to Florida and began partnering with others in short term rentals of properties. He loved the real estate business and wanted to pursue it. Unfortunately, his use of meth and alcohol prevented any lasting success. Clearly not on the right track, Mr. Miao involved himself in the offense conduct in this case. It was an ill-advised way to use his intellect. He is committed to using it properly and productively in the future. His thoughts are set forth in his letter to the Court in the portion labelled "Reflections":

When I moved to America, my uncle in Zhengzhou said, "I trust you Jiahui. Make sure you don't do anything you will regret." I definitely did not follow his advice.

My years at MDC-Brooklyn forced me to face the hard truth of my bad choices. I spent many days praying, meditating, and doing what I could to support other inmates. I did everything possible to use my time at MDC productively and positively. I took as many classes as I could. I completed classes on parenting, banking, financial literacy, sports, and puzzles/brain activity plus I studied psychology and astronomy. My supervisor in food service wrote a support letter based on my good work in that department.

I was thankful for the chance to take classes in the Non-Residential Drug Addiction Program. The classes helped me see that my heavy drinking and drug abuse was out of control for a long time. As I wrote earlier, I started drinking heavily when I was 13 years old. I had family members who struggled with alcoholism and addiction. I know my life would have been much better without alcohol or meth. Especially as someone with childhood trauma, I could never drink or use drugs without danger. I definitely owe my family a future of sobriety and good decision-making.

The lessons I have learned at MDC should have been obvious to me earlier in life. I should not have associated with people who I knew were involved in illegal activity. I should have stayed far away and not let bad people influence or pressure me. Additionally, I have learned that taking shortcuts in life does not pay. I should always do things the right way and not the wrong way. I will never break any laws or get involved in shady business deals again.

In the future, I want to run a small business that supports the local community by creating jobs. This way I can give my neighbors an income to support themselves and their families. Then they can put their earnings back into the local community when they spend it. This is the way it should be. Additionally, I want to marry a wise, responsible woman and start a family. Focusing on my family will help me remain on the right path and not allow me any free time to waste on negative things.

Before the court remanded me to MDC, I attended services at Harvest Church of New York in Little Neck. My new Christian brothers brought me to church and gave me emotional support. The church helped me think about the harm I caused to my victims, my family, and myself. I let them down but I have not forgotten what I have heard. I still feel the anger from my childhood trauma but I will

deal with it properly through religion and therapy. Thankfully, the Gospels show the way forward even after my worst decisions. I have faith I can atone for my actions, heal my heart, then move ahead to a better future.

Your Honor, I want to tell my story to help others learn from my poor judgments and moral failings. I will volunteer my time to help the local community so that I can be selfless instead of selfish. I am committed to becoming a better person overall and never making bad choices like this again.

In closing, I am sorry for breaking the law and abusing America's financial system. I loved my time in the United States. In a short period of time, I saw Maine, Florida, New York City, Texas, and many other places. People were kind to me. I had great teachers, neighbors, and friends. My selfish choices will mean I can never return to this great country. I am very sorry and very sad about that. Of course, I am responsible for my actions and the consequences. I will serve my sentence in peace and never forget the important lessons I learned here.

*See* Ex. A, Letter to the Court from Jiahui Miao. The fact is that Mr. Miao's detention, while difficult at the MDC, was what he needed to properly reflect on his behavior, both prior to and after his arrest, and the need to readjust his conduct and perspective. As indicated in the PSR, ¶123, page 29, Mr. Miao was diagnosed with "unspecified depressive disorder" and was recommended for weekly individual treatment. He attended both individual psychotherapy and a psychiatric evaluation. He was cooperative and prescribed Prozac until he was remanded. His commitment to therapy is a further acknowledgment that treatment is the better means with which to address his past.

We attach herewith as Ex. B, the following letters in support of Mr. Miao:

| Name | Relationship to Mr. Miao |
|------|--------------------------|
| **Cindy Hogan** | Australian Homestay Mother |
| **Yang Zhao** | Highschool Friend |
| **Huijie Lin** | Friend |
| **Keith Rando** | Friend |
| **Lixin Wu** | Friend |
| **Samantha Greene** | Friend |
| **Dr. Wei Zhang** | Doctor at Department of Critical Care Medicine, Tianjin First Central Hospital, China. |

The letters are from friends and colleagues, who while clearly not aware of Mr. Miao's conduct while they interacted with him, attest to his kindness and intellectual fortitude. They are all disappointed in him, acknowledge that punishment is in order but also know that he is worthy of leniency and consideration.

### *The Conditions of Confinement at the Metropolitan Detention Center and Immigration Consequences*

We respectfully ask that the Court consider the extreme and overly punitive restrictions at the MDC as well as Mr. Miao's certain deportation upon completing his sentence.

While the conditions at the MDC are different in nature than those implemented during the Covid-19 pandemic (*see United States v. Ramos*, 2020 WL 3642050, *2 (S.D.N.Y. July 6, 2020) (Engelmayer, J.), (a "serious danger to society at large"); *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020)), the facility remains plagued with the gang violence, inadequate medical attention and frequent lockdowns. While recent improvements have been made

with an increase in staff and a decrease in the inmate population, the fact is that the violence persists as do frequent lockdowns during which inmates are confined to their cells. The continuing havoc at the MDC was noted by Judge Gary Brown in the sentencing of Daniel Colucci. *United States v. Colucci*, No. 23 Cr. 417 (GRB) (E.D.N.Y. Aug. 5, 2024). Judge Brown sentenced Mr. Colucci to nine months in prison however with the condition that he not be designated to the MDC. In issuing this condition, Judge Brown noted in his order that the sentence was made more complicated by "… an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the MDC." *Id.* at D.E. 213. Specifically, the Court alluded to the well documented and frequent lockdowns due to violence and the threat of violence, the arrest of a corrections officer in 2023 for smuggling narcotics, cigarettes and cell phones into the facility, gang violence and the murders of inmates in the facility.

In yet another case, Judge Jessie Furman found that MDC's conditions constituted "exceptional reasons" to continue a defendant's release on bond pending sentencing. *See United States v. Chavez*, No. 22 Cr. 303 (JMF) (S.D.N.Y. Jan. 4, 2024). He cited "near perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care." *Id*. at D.E. 31. Judge Furman referred to dockets of the Court filled with cases addressing these issues and cases in which reduced sentences were given due to the conditions at the MDC. *See United States v. Day*, No. 19 Cr. 619 (CM) (S.D.N.Y. April 29, 2021), D.E. 35; *United States v. Morgan*, No. 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), D.E. No. 90. Judge Furman noted MDC's "severe staff shortage" as the likely reason for the intolerable conditions.

Mr. Miao has been subjected to these conditions since his remand in March 2024. And yet, he has had no disciplinary issues since his incarceration. He keeps to himself and he speaks to

other inmates that are not inclined to violence and gangs about his life and does his best to convince them to follow a more productive path.

While we understand that prison is restrictive, the conditions at the MDC, well documented in the past years are not the conditions contemplated or taken into consideration as a matter of common law or by the Sentencing Commission. We respectfully submit that the Court consider the conditions to which Mr. Miao has been subjected in determining the appropriate sentence in this case.

Despite the conditions described above, Mr. Miao has managed to participate in every program he was permitted to. Mr. Miao completed the following educational courses:[3]

| Number | Educational Course | Date Awarded |
|--------|--------------------|--------------|
| 1. | Adult Continuing Education: Money Values | May 24, 2024 |
| 2. | The National Parenting Program: Phase One | June 28, 2024 |
| 3. | You Can Bank On It | November 15, 2024 |
| 4. | Sentry Journal (Health Journal) | February 21, 2025 |
| 5. | The Maintaining Positive Change Psychology Workbook | February 27, 2025 |
| 6. | Your Savings | March 21, 2025 |
| 7. | My Individual Change Plan Workbook | April 7, 2025 |
| 8. | S.T.E.M. Seminar Series offered by Columbia University | May 16, 2025 |
| 9. | Quiet Moments | May 28, 2025 |
| 10. | Responsible Behavior | June 6, 2025 |
| 11. | Non-Residential Drug Abuse Program – 3 | June 24, 2025 |

---

[3] *See* Ex. C, Certificates Awarded to Mr. Miao and PSR ¶118.

14

| | Months of Weekly Strategies for Change Non-Residential Drug Abuse Counseling | |
|---|---|---|
| **12.** | Change Plan | July 1, 2025 |
| **13.** | My Healthy Relationships | July 18, 2025 |
| **14.** | Responsibility and Personality Responsibility | July 21, 2025 |
| **15.** | My Coping Skills | August 25, 2025 |
| **16.** | Strategies For Change | August 25, 2025 |

In addition to availing himself of the educational opportunities available at the MDC, Mr. Miao holds the position of unit orderly. In January of 2025, he received "outstanding" ratings in seven of the eight categories listed on his inmate work performance rating with the following justification for the award of a bonus:

> AIC Miao is a self-starter with leadership qualities who thrives in a fast paced, growing environment. He practices correct food handling and food storage procedures according to company and state regulations. Miao is a standout amongst AIC's in his willing to go above and beyond his assigned tasks. Miao's leadership has contributed to very high productivity from the food service dept.

*See* Ex. D, Inmate Performance Rating.

Mr. Miao has done his best to find a better path in life, even while in prison. He is drug and alcohol free, he participates in every program available to him and has demonstrated his work ethic to his superiors.

We also ask the Court to consider the immigration consequences which will ensue from conviction. Mr. Miao came to the United States on a student visa. It has expired and he will be deported upon completion of his sentence. Even without contesting the deportation order, Mr. Miao will be transferred to an immigration facility and held for months before his departure. This

extended period will be in addition to this Court's sentence. Moreover, given his lack of status, Mr. Miao will not be eligible for programs such as RDAP and other programs which, when successfully completed, are designed to reduce an inmate's sentence.[4] Inmates subject to a final order of removal are ineligible to receive credits under the First Step Act. These programs, many of which Mr. Miao has availed himself of with success, are designed to facilitate rehabilitation and re-acclimation into society. Mr. Miao will not have these benefits. While Mr. Miao's deportation and lack of status is a given, we do ask that the Court consider that the immigration consequences will result in a longer period of incarceration and his ultimate removal.

### 18 U.S.C. § 3553(a)(2)(A), (B) and (C): The Need for the Sentence Imposed to Reflect the Purposes of Punishment Contained in the Federal Sentencing Statute

With regard to specific deterrence, Mr. Miao recognizes the seriousness of this offense and how it has adversely affected his life. His incarceration has brought him in line with the proper goals and morals he needs to live with. While a term of imprisonment is certainly expected, the time he has spent at the MDC along with the impending period of incarceration this Court will impose will serve the purpose of specific deterrence. We respectfully submit that a sentence below the advisory guideline range will be sufficient to satisfy the personal deterrence factor for Mr. Miao.

With respect to general deterrence, a justifiable concern of this and other sentencing courts, we respectfully submit that others similarly situated would hesitate to commit this offense knowing that it would result in a felony conviction, a prison sentence and certain deportation. The question is how long a prison sentence under these circumstances is appropriate. The ramifications from

---

[4] Notwithstanding his ineligibility for the RDAP program, Mr. Miao did participate in the Non-residential Drug Abuse Program while at the MDC. He was assessed on March 19, 2025 and found to have "problematic substance abuse" issues which qualified him for intervention. *See* Ex. E, BOP Psychology Services NRDAP-Administrative Note. Mr. Miao completed the program on June 24, 2025.

this offense are especially impactful given the collateral consequences that will ensue. We ask the Court to consider these factors in determining the appropriate sentence.

<strong>Conclusion</strong>

As with all sentencing proceedings, there is the offense which must be punished and the human being that must be considered in meting out the just result. It is these details which inform that "uniform and constant" principle "that every convicted person [be considered] as an individual and every case as unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81 (1996). This was a serious fraud and unsuspecting victims suffered financial loss. While Mr. Miao was not the architect of the scheme and did not participate in the underlying fraud, he facilitated the movement of funds from it for personal gain. His pretrial release conduct further complicates his sentencing consideration. On the other hand, his incarceration at the MDC has provided him an opportunity to reflect on his past, from his childhood to the doors of the prison, and he has successfully commenced a path towards rehabilitation. His is remorseful for his conduct and how the direction he took has altered his trajectory in a most deleterious way. He has the intellectual fortitude to succeed and his moral compass has been properly adjusted. We hope that this Court will consider these competing narratives and arrive at a sentence somewhat below the advisory guidelines as sufficient but not greater than necessary to satisfy the goals of punishment.

Dated:          October 1, 2025
                New York, New York


                                                Respectfully submitted,

                                                _____/s/_____
                                                JAMES KOUSOUROS

17