UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA, : 22-CR-458 (LDH)

Plaintiff,

-against- : United States Courthouse : Brooklyn, New York

JIN FU ZHANG,

Defendant. : Wednesday, February 11, 2026 : 11:30 a.m.

- - - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR A SENTENCING
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: JOSEPH NOCELLA, JR., ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: BENJAMIN WEINTRAUB, ESQ.
Assistant United States Attorney

For the Defendant: MOSES & SINGER, LLP
405 Lexington Avenue
12th Floor
New York, New York 10174
BY: BARRY S. ZONE, ESQ.

Court Reporter: DAVID R. ROY, RPR
225 Cadman Plaza East
Brooklyn, New York 11201
drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand, transcript produced by Computer-Assisted Transcription.

P R O C E E D I N G S

--ooOoo--

(In open court.)

(Interpreter sworn.)

THE COURTROOM DEPUTY: All rise.

Good morning. This is a criminal cause for a sentencing in the matter of USA versus Jin Fu Zhang, Docket Number 22-CR-458.

The Mandarin interpreter has been previously sworn.

Counsel, please state your appearances for the record, starting with the Government.

MR. WEINTRAUB: Good morning, Your Honor.

Benjamin Weintraub for the United States, and I'm joined at counsel's table by an intern in our office for this semester, Lea Herzfeld, as well as United States Probation Officer, Meghan Wing.

THE COURT: All right. Well -- where are we at? Good morning to you all and welcome.

MR. ZONE: Good morning, Your Honor.

Barry Zone for Jin Fu Zhang, who stands beside me, and we have the assistance of Ms. Lily Lau as the translator.

THE COURT: All right, wonderful. Good after- -- morning to you all as well.

You may be seated.

All right, folks, so we're here today for a sentencing determination on the Indictment against Mr. Jin Fu Zhang.

Present today are counsel for the Government, as well as the defense. The defendant is present, a representative from the probation departure, and an intern from the U.S. Attorney's Office.

All right. Now, on August 7th of 2024, Mr. Zhang pleaded guilty to Count 10 of the Indictment, which was filed on October 6th of 2022.

Now, Count 10 charges that in or about and between May of 2021 and August of 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the Defendants Jin Hua Zhang, also known -- I'll skip that -- and Jin Fu Zhang, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the T5 Victims and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds contrary to *Title 18 United States Code Section 1343*.

Now, on August 6th, 2024, in and August -- excuse me -- 6/2024 agreement with the Government, Mr. Zhang further stipulated to an additional offense, specifically that between in or about May 2021 and August 2022, he knowingly and intentionally participated in a conspiracy to commit money laundering. Now, this Court found that Mr. Zhang made his plea knowingly and voluntarily and that there was a factual basis for his plea. Accordingly, this Court accepted Mr. Zhang's plea of guilty to Count 10 on February 10th of 2026.

Now, in advance of this proceeding, I received and I reviewed the October 6th Indictment filed as ECF Docket Number 1; an April 24th, 2025, Presentence Investigation Report filed as ECF Docket Number 307; the Government's May 8th, 2025, objection to the Presentence Report; the Government's June 26th, 2025, Sentencing Memorandum and related exhibits filed as ECF Docket 330; an October 3rd, 2025, Addendum to the Presentence Investigation Report filed as ECF Docket 372; a December 12th, 2025, Second Addendum to the Presentence Investigation Report filed as ECF Docket Number 395; Defendants January 13th, 2026, Sentencing Memorandum filed as ECF Docket Number 399; a January 20th, 2026, Third Addendum to the Presentence Investigation Report filed as ECF Docket Number 400; and a February 4th, 2026, Letter to the Court from Mr. Zhang filed

as ECF Docket Number 401. And the Court has also reviewed, as I made reference to earlier, the August 6th, 2024, agreement between Mr. Zhang and the Government.

Anything else?

MR. WEINTRAUB: No, Your Honor.

THE COURT: Anything from Defense?

MR. ZONE: No, Your Honor.

THE COURT: Okay.

Okay. Mr. Weintraub, any witnesses present in the courtroom today?

MR. WEINTRAUB: No, Your Honor.

THE COURT: Am I correct you don't believe I need to hold any sort of evidentiary hearing to resolve any disputed issue of fact?

MR. WEINTRAUB: No, Your Honor.

THE COURT: Okay.

All right. So, Mr. Zone, have you and Mr. Zhang had an opportunity to read and discuss the Presentence Report?

MR. ZONE: Yes, Your Honor.

THE COURT: And you've discussed whether you have any objections thereto?

MR. ZONE: Yes, Your Honor.

THE COURT: All right.

And you've joined in the Government's objection,

Paragraphs 87 and 89, correct?

MR. ZONE: Yes, Your Honor.

THE COURT: All right.

Do you have any witnesses present today?

MR. ZONE: I do not. The only one in the courtroom for my client is his wife. She's just here in an observing capacity.

THE COURT: Over there?

UNIDENTIFIED FEMALE: (Indicating.)

THE COURT: All right. Thank you.

I'm certain Mr. Zhang appreciates you here for support.

And am I correct you don't believe I need to hold any sort of evidentiary hearing to resolve any disputed issue of fact?

MR. ZONE: No, Your Honor.

THE COURT: Okay.

All right. Now, let me talk about the maximum sentences available.

With respect to Count 10, the maximum term of imprisonment is 20 years. The Court may impose a term of supervised release of not more than three years. Because Count 10 is a Class C Felony, the defendant is eligible for not less than one nor more than five years of probation. However, one of the following must be imposed as a condition

of probation unless extraordinary circumstances exist, and those would be a fine, restitution, or community service.

The maximum fine is $250,000. And, of course, the Court must impose a special assessment in the amount of $100 per count. In this instance, one count, $100.

All right.

Give me a moment.

(Pause in proceedings.)

THE COURT: Now, the PSR calculates a guidelines range of 121 to 151 months, and that's based on the total offense level of 32 and a criminal history category of 1.

So the Government has lodged an objection to the calculation of the guidelines, specifically with respect to the probation department's assignment of only a 2-point reduction based on the defendant being a minor participate. The Government has argued that the defendant should be deemed a minimal participant warranting a 4-point reduction.

Now, I have reviewed the information contained in PSR, and I agree with the Government, that I believe that based on the information that I have that Mr. Zhang, indeed, is deserving of the 4-point reduction based on a minimal role, and that's in consideration of the factors set forth in *Sentencing Guideline Section 3B1.2*, Application Note 3C wherein the Court looked to the degree in which he understood the scope and the structure of the criminal

activity, the degree in which he participated in planning or organizing of the criminal activity, the degree to which he exercised the decision-making authority or influenced the exercise of decision-making authority, and the nature and the extent of the defendant's participation in the commission of the criminal activity, and the degree to which the defendants stood to benefit. My estimation, those factors weigh in favor of the application of the minimal-role adjustment.

Now, the Government did not specifically object to another aspect of the guidelines range calculation and nor did the defense.

MR. WEINTRAUB: The minimum -- the Chapter 4 issue?

THE COURT: The issue regarding the Chapter 3 issue -- 3 issue?

What -- when it is that you apply the minimal role adjustment in the calculation, and I looked to the PSR, and I looked to the sentencing guidelines, and in my estimation, the probation department has properly calculated the guidelines based on the application notes there.

Now, before everybody gets really exercised about this, because it certainly results in a much higher guidelines calculation than you -- I think that -- at least the Government and the defense had contemplated when they

reached this agreement, I believe that the rubber meets the road in this case when we talk about the treatment of the loss -- the calculation with respect to a departure based on the driving factor of the loss amount here. I think that's where the rubber meets the road here, folks, and I'm going to get to that.

But I need to calculate the guidelines in a manner that I believe is consistent with the sentencing guidelines themselves, which I intend to do, and then we will address the issues and the arguments made in your submissions that might warrant a departure or a variance.

Fair enough?

MR. WEINTRAUB: Yes, Your Honor.

THE COURT: All right.

And as there was no, also, objection that was lodged to this portion of it. But in any event, it is not my intention to impose an outside sentence unnecessarily, all right?

Give me a second.

(Pause in proceedings.)

THE COURT: All right. Here we go.

So just so that we're clear, I am adopting the PSR. However, I am sustaining the Government's objection with respect to the minimal participant classification, and so things are going to be moved around just a little bit.

Mr. Weintraub, are you with me?

Your face --

MR. WEINTRAUB: I -- I'm not sure --

THE COURT: -- indicates perhaps not.

MR. WEINTRAUB: I'm not sure I am.

I just -- I want to be sure I am, so --

THE COURT: You saw in the -- I think that the probation department addressed this issue in one of the addendums.

MR. WEINTRAUB: Certainly, they addressed the issue of the minimal versus the minor --

THE COURT: They addressed both of these issues --

MR. WEINTRAUB: Okay.

THE COURT: -- in their -- hold on.

I just have to find it.

MS. WING: Your Honor, if it helps, it's Objection Number 2 in the third addendum.

THE COURT: It does help. Thank you. I would have been here for quite some time.

If you look at the third addendum, it's the second page.

Did you both miss this? And I mean "both" as in the Government and the defense.

MR. WEINTRAUB: No, that's -- no. I don't -- I don't have an objection to that aspect of --

THE COURT: You understand --

MR. WEINTRAUB: I understand. I don't --

THE COURT: -- it does change --

MR. WEINTRAUB: Yes. And I think that we might have gotten it wrong in our plea agreement.

THE COURT: I think you did.

MR. WEINTRAUB: That's -- that happens, unfortunately --

THE COURT: Okay.

MR. WEINTRAUB: -- and I don't object to that --

THE COURT: So you don't have an objection to it? I just --

MR. WEINTRAUB: No. I mean, I advocate, as I think the Court anticipates, that -- a sentence in line with what we had initially understood the guidelines to be is appropriate. I don't disagree with the third addendum --

THE COURT: Right.

MR. WEINTRAUB: -- with respect to Objection 2.

I thought that just the -- the only thing I was also a little bit confused on is in the PSR, the 2-point reduction for 0-point offender is -- is sort of applied at the very end; whereas, in the plea agreement it's applied sort of with respect to the -- you know, first -- the wire fraud conspiracy.

That was the only thing that was actually

confusing me --

THE COURT: Okay.

MR. WEINTRAUB: -- but I'm --

MR. ZONE: I apologize.

THE COURT: So are we all on the same --

MR. WEINTRAUB: Yes.

THE COURT: -- sheet of music?

MR. WEINTRAUB: Now we are.

THE COURT: I believe that the way in which the probation department has set out, kind of, the mechanics of coming up with the guidelines calculation in this case given the cross-reference, right, between the base offense level is the appropriate manner in which to do the calculation. It results in a higher guidelines range than the parties contemplated.

I understand, and not surprisingly, that the Government maintains that an appropriate sentence is within the guidelines range that you all had calculated as opposed to the higher guidelines calculation that the Government -- the probation department and the Court's calculation will yield.

But, again, I believe that -- that the disparity between those two will be addressed when the Court addresses your argument for a departure.

MR. ZONE: Okay.

So, basically, what I'm just trying to wrap my head around is the 2.0 -- the 2-point reduction for 0-point offender comes off of where?

THE COURT: Why don't you let me walk through this. You can listen to the way in which I am -- hold on.

Let me see, because I don't want to do this out of turn. Hold on.

(Pause in proceedings.)

THE COURT: Minimal roles, two levels -- hold on. Two levels, two levels here -- two levels, two levels.

In the PSR -- where is it?

I have it after the grouping analysis. And then I have him meeting the 2-point reduction. I just want to kind of do -- it's kind of hard for me to just pick this out for you all. So it would be easier if you listen to my calculation, and if you have an objection to my calculation, you voice it based on what I articulate, all right? Fair enough? Let's try that.

All right, folks. The guideline for a violation of *18 U.S.C* is *Section 1349* based -- sorry -- is *Sentencing Guideline Section 2X1.1*, which per that guideline, provides a base offense level from the guideline for the substantive offense, plus all specific offense characteristics corresponding to the underlying activity.

So, folks, here, the substantive offense is wire

fraud. The guideline is *Guideline Section 2B1.1(a)(1)* providing a base offense level of 7.

Now, because the loss was more than $9,500,000, but less than $25 million, 20 levels are added, which brings the adjusted offense level to 27.

Because the offense resulted in the substantial hardship of five or more victims, an additional four levels are added, which brings the adjusted offense level to 31.

Now, because the offense involved sophisticated means, an additional two levels are added, which brings the adjusted offense level to 33.

Now, because the defendant was minimal participant in the offense, the offense level is decreased by 4. That puts us at 29, all right?

Now, stipulated conduct of money laundering conspiracy, the guideline for a violation of *18 U.S.C.* is *1956(h)* is *Sentencing Guideline Section 2S1.1*, which pursuant to that, the guideline provides a base offense level for the underlying offense from which the laundered firms were derived is used if the defendant committed the underlying offense and the offense for that offense can be determined, which it can.

Accordingly, the base -- based on the calculation of Count 10, the base offense level is 33, right?

That gives you the base offense level, plus the

specific offense characteristics, which pursuant to the guidelines, is what you use, right? If you look at the cross-reference guideline, this is the way it works, folks, all right?

Now, in addition because the defendant was convicted under *18 U.S.C., Section 1956*, two levels are added, which brings the adjusted offense level to 35 *Subsection (b)(2)(B)* applies and the offense involved sophisticated laundering, an additional two levels are added pursuant to *Sentencing Guideline Section 2S1.1(b)(3)*. Accordingly, we land at adjusted offense level of 37.

I must, of course, engage in the grouping analysis pursuant to which the units are assigned pursuant to *Sentencing Guideline Section 3D1.4(a), (b), and (c)*. One unit is assigned to the group with the highest offense level, and one additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious, and one half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level in any group that is 9 or move levels less serious than the group with the highest offense level is simply disregarded.

Now, Count 10 in the stipulated conduct are grouped together; thus, the group defense level Count 10 and the stipulated conduct is 37, the defendant has demonstrated acceptance of responsibility for the offense accordingly,

the offense level is decreased by 2, which brings it down to 35.

I understand that the Government intends to make a motion indicating that it was notified in a timely manner of the defendant's intention to enter a plea of guilty.

Is the Government making that motion?

MR. WEINTRAUB: Yes, the Government so moves.

THE COURT: Okay.

Accordingly, an additional 1-point reduction is warranted, which brings the adjusted offense level to 34, and as well, the defendant meets the criteria set forth in *Sentencing Guideline Section 4C1.1(a)(1) through (10)*. That is the 0-point offender, and the offense level is reduced by an additional 2 points, which brings the adjusted total offense level to 32.

Now, I have to take into account the defendant's criminal history, which gives the Court a criminal history score of 0. Criminal history score of 0 establishes a criminal history category of 1.

Based on the total offense level of 32, criminal history category of 1, the guideline term for imprisonment is 121 to is 151 months.

Yes?

MR. WEINTRAUB: Okay, Your Honor, I've consulted with Probation Officer Wing, and the only thing that -- and

I apologize for not catching this earlier, that we think might need an adjustment is if you -- the Court were to look at Paragraphs 91 and 92 of the PSR, which are the adjustments based on a conviction under *18 U.S.C. 1956* --

THE COURT: Yep.

MR. WEINTRAUB: -- and --

THE COURT: Wait. You said -- where am I? Paragraphs --

MR. WEINTRAUB: 91 and 92.

THE COURT: Yeah.

MR. WEINTRAUB: I think because this defendant only stipulated to that conduct, he was not actually convicted of that conduct. I think --

THE COURT: But stipulated conduct for the purposes of sentencing guidelines are to be treated as if he had been convicted of that offense.

So how do I exercise --

MR. WEINTRAUB: I -- I think if --

THE COURT: -- show me how -- direct me to where you're suggesting that I don't apply it, and I'm happy to adjust.

MR. WEINTRAUB: I think if you just take off those 4 points -- because my understanding of how that -- of what it meant to be -- to stipulate to conduct so that it's as if he was convicted, was that the Court would consider it, you

know, for purposes of the guidelines, but he actually does not -- does not have a conviction of it.

So I would just strike Paragraphs 91 and 92 and take 4 points off of the offense level. That's my proposal on it.

I think that probation officer --

THE COURT: I -- I -- somebody help me here because --

MS. WING: Your Honor --

THE COURT: -- as if -- was convicted -- so direct me.

MS. WING: I'm looking at the guideline now, just a few -- just quickly, I'm looking at *1B1.3* --

THE COURT: Okay.

MS. WING: -- to see the language regarding stipulation --

THE COURT: I would appreciate that.

So what -- *1B* what?

MS. WING: I'm sorry, Your Honor. *1B1.2(c)*.

THE COURT: *1B1* -- *1B1.2(c)*.

All right. I'm -- let's see, if this got -- direct me to do so, I'm happy to do that, but I've got to look at it. I have to see it.

Okay. Where am I -- *1B1.2(c)*?

MS. WING: Yes, Your Honor.

Now, reading the language in there --

THE COURT: Hold on a second.

(Pause in proceedings.)

THE COURT: What -- this is helping me how?

MR. WEINTRAUB: No -- Your Honor, I'm going withdraw. If the Court looks at the Commentary Note 3 --

THE COURT: Yes.

MR. WEINTRAUB: -- it further clarifies that stipulated conduct. It's really treated as the Court initially thought --

THE COURT: As it --

MR. WEINTRAUB: -- as if he was convicted. So these --

THE COURT: Right.

MR. WEINTRAUB: -- instances, I think, would apply, so --

THE COURT: I think they do --

MR. WEINTRAUB: -- I would withdraw that and --

THE COURT: That's fine.

Folks, listen, I understand the Government's view of this individual's conduct relative to the whole. I understand that the guidelines calculation here is far outside from the guidelines calculation in the plea agreement. I have the ability based on what I believe is consistent with the sentencing guidelines and my directive

not to sentence anyone to a sentence that's greater than what I believe is sufficient and not more than necessary to comport with the aims of sentencing, and I intend to do that.

MR. WEINTRAUB: And I appreciate the Court's, sort of, generosity of time in allowing us to muddle through this together. I appreciate that.

THE COURT: Better to get it right.

MR. WEINTRAUB: Thank you.

THE COURT: Counsel?

MR. ZONE: Yes. I just -- it's just a -- a further leap that has to be --

THE COURT: It -- it is --

MR. ZONE: -- you know?

THE COURT: -- and it's -- look, the guidelines range is different than what you wanted. It doesn't change your argument. I'd like to move along so we can get to your argument --

MR. ZONE: Sure.

THE COURT: -- right, which may hold even greater water here. So let's move forward.

Okay. So supervised -- because Count 10 is a Class C Felony, the guidelines range for a term of supervised release is 1 to 3 years. Because the applicable guideline range is in Zone D of the sentencing table, the

defendant is ineligible for probation. The fine range for the offense is 35,000 to $250,000.

All right. Any objections to the Court's calculation of the guideline range?

From the Government?

MR. WEINTRAUB: No, Your Honor.

THE COURT: Defense?

MR. ZONE: No, Your Honor.

THE COURT: All right.

MR. ZONE: May I have one minute with my client just to tell him a little bit quickly -- very -- very quickly?

THE COURT: Yes.

(Pause in proceedings.)

MR. ZONE: Thank you, Your Honor.

THE COURT: All right. Okay.

All right. Am I correct that the Government is not seeking to apply any global dispositions that might have been contemplated by that agreement?

MR. WEINTRAUB: Correct, Your Honor.

THE COURT: Okay.

All right, folks. Now, at this time, I'll hear from the parties concerning any bases for departure.

Anyone?

MR. ZONE: Your Honor, I think under *3553(a)* will

be our --

THE COURT: Your arguments? Okay.

All right. Having no arguments on departures, what I will look to at this point -- I'm sorry -- having calculated the guidelines and consented the propriety of the departure, I must now consider the relevant factors set out by Congress in *18 U.S.C. Section 3553(a)* to ensure that I impose a sentence that is sufficient, but not greater than necessary, to comport with the aims of sentencing.

Now, the purposes include the need for the sentence to reflect the seriousness of the crime, promote respect for the law, and provide just punishment for the offense. The sentence should deter criminal conduct, protect the public from future crime by the defendant, and promote rehabilitation.

In addition to the guidelines and policy statements, I must consider the nature and the circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentences disparities among similarly situated defendants, the types of sentences available, and the need to provide restitution to any victims of the offense.

At this time, does the Government wish to make any arguments concerning the application of those factors, request a variance, or otherwise make a sentencing

recommendation?

MR. WEINTRAUB: Thank you, Your Honor.

THE COURT: Yes, go ahead.

MR. WEINTRAUB: This is, I believe, maybe the fourth or fifth time at this point that the Government has appeared before the Court in this case at sentencing, so, of course, the Court is familiar with the Government's arguments.

The Government submits that a sentence within the guidelines range of -- well --

THE COURT: Contemplated by the parties in their agreement?

MR. WEINTRAUB: Yes. Thank you, Your Honor.

Within the range of 63 to 78 months would be appropriate here.

Let me start off with situating the defendant relative to the other defendants and --

THE COURT: Which I think you put him at the least culpable of everyone?

Am I mistaken about what I --

MR. WEINTRAUB: It's -- yeah --

THE COURT: -- as I read it?

MR. WEINTRAUB: Yes. That is not -- that is not how we view him. It's --

THE COURT: It's not?

MR. WEINTRAUB: No. It's a bit complicated because --

THE COURT: Okay. Though, minimal --

MR. WEINTRAUB: The defendant --

THE COURT: I -- just so we're clear, the other defendants, whom I've sentenced, in their role in the offense, they had minor role adjustments. The Government here specifically advocated for a minimal role adjustment, which objectively says you believe that his role was less than because it is all relative. It's not as if I can view the other defendants in isolation.

MR. WEINTRAUB: Your Honor, Mr. Zhang is the only defendant to have pled guilty to wire fraud conspiracy.

THE COURT: Yes.

MR. WEINTRAUB: All of the other defendants pled guilty to a money laundering conspiracy --

THE COURT: Yes.

MR. WEINTRAUB: -- so the Government's conception of this crime is that there are two different crimes: There is the wire fraud conspiracy, and only Jin Fu Zhang and his brother, Jin Hua Zhang, have pled guilty to that. The Government's conception of the wire fraud conspiracy is the large overarching, pig-butchering-global scam. Then there's the money laundering conspiracy, which is the conspiracy to launder the proceeds from that.

That's what all the --

THE COURT: So you're saying, Judge, they're not necessarily relative to each other in this case because you're actually talking about the wire fraud versus the money laundering?

MR. WEINTRAUB: Correct. The -- correct.

The Government does not believe -- it did not charge any of the other defendants with wire fraud conspiracy. It doesn't believe that they were culpable of wire fraud conspiracy, so... Whereas Mr. Jin Fu Zhang and his brother, Jin Hua Zhang, were charged with that and both pled guilty to that.

So the way I would just say it in very simple terms, is they are -- he is a minimal participant in a much larger, much more insidious, much more financially devastating wire fraud scheme --

THE COURT: I get it.

MR. WEINTRAUB: Okay.

And that's why he's not a minimal- or minor-role participant in the money laundering conspiracy, whereas all the other defendants are minimal- or minor-role participants in the money laundering conspiracy.

THE COURT: I got it.

MR. WEINTRAUB: So that's --

THE COURT: I think I've got it.

MR. WEINTRAUB: Thank you.

THE COURT: Now -- which was just for him. The stipulated conduct but had -- but -- but in any event, his role wouldn't have warranted the minor role --

MR. WEINTRAUB: Correct. Whereas --

THE COURT: -- in the money laundering?

MR. WEINTRAUB: Correct. Whereas all the other defendants, you know, I think --

THE COURT: Where would he have been in the money laundering conspiracy?

MR. WEINTRAUB: So let's just talk about then what his role was in this case.

THE COURT: Yes.

MR. WEINTRAUB: So it all starts with -- the crime here all starts with this global pig-butchering scam, and as the Government, sort of, laid out in its sentencing letter, the way that it works is you have victims in the United States, and you have people who are on the other end of a phone or a WhatsApp or a LinkedIn or whatever --

THE COURT: Yes.

MR. WEINTRAUB: -- sort of communication, and they're sitting in these call centers in Asia, and basically, when somebody in Asia has a victim on the hook ready to give over money, what needs to happen then is that the victim needs to be provided with a bank account to send

the money to. The person sitting in the call center in Asia does not know or does not have a bank account. They are literally one amongst thousands of peoples sitting in a call center. They don't have the bank accounts at the ready.

That's where this money laundering group of people came into play. They're the ones who set up the bank accounts that were ready to receive the victim money.

So when you had a victim ready on the hook, ready to give money over to the scammers, a group of the scammers, what we refer to as the "managers," would reach out to Jin Hua Zhang and Jin Fu Zhang and say, We have a victim ready. John Doe 1 is ready. You know, We need a bank account.

Then Jin Fu Zhang and Jin Hua Zhang would go back to their group of people, all of the other people charged and say, Who's got an account ready? Who has an account available?

Why that -- why they ask that is because these accounts get shut down. These accounts -- you don't want to do too much -- too many transactions in too quick of a time period.

So then they hear back from their folks who have an account available. They get that account. They then pass that account information over to the managers who then pass it back to the scammers in the call center who then

text it to the victim, and then the victim wires his money to the bank account.

So that's the role that the defendant and his brother played.

THE COURT: He played the role of identifying the accounts that the victims would ultimately transfer the funds to through the use of the call center? He identified the account?

MR. WEINTRAUB: He facilitated -- yes, he identified and -- and it's more than just identified. He sort of was a go-between between the scammers who said we need an account and the group of money launderers who had the accounts in their names, and then he facilitated it.

THE COURT: I see.

MR. WEINTRAUB: He was, like, a matchmaker.

THE COURT: So all of the folks that I previously sentenced were the folks with the accounts in their name. The current defendant served as the intermediary between those individuals --

MR. WEINTRAUB: Yes.

THE COURT: -- right?

And the call center, which ultimately provided the information to the victims.

MR. WEINTRAUB: Yes. He's on direct communications with the people who are in Asia and that are

much higher --

THE COURT: Yes.

MR. WEINTRAUB: -- level of orchestrating this fraud than any of the other defendants.

And the reason that he didn't, in the Government's view, merit an aggravated role with respect to the money laundering now, is because -- is that he is taking direction from his brother, Jin Hua Zhang, and he wasn't exactly exercising managerial oversight over the group of money launderers, who I'm going to say, below him.

So that's where if you -- there's where the Government in its plea agreement views him as a minimal participant in the wire fraud conspiracy because he doesn't have an understanding of the scope of the conspiracy, all of the things that are set out in *3B1.1* when it comes to the factual facts --

THE COURT: Yes.

MR. WEINTRAUB: -- for the Court to consider.

That's why the Government believes him to be a minimal participant in the wire fraud conspiracy. He's not a leader or a manager of the money laundering conspiracy because he is facilitating, he's -- at his brother's direction, he's then going back to the other -- other people in this scheme and saying, Who's got an account, but he's not really managing them or overseeing them in a way that we

believe -- the Government believe that a enhancement was available.

So that's --

THE COURT: Yeah. So -- you know, and in a minute I'm going to be talking to the defense, and the defense is going to, I imagine, spend at least some time talking about the fact that the loss amount is really driving up this sentence, and I'm trying to understand the Government's view of this particular defendant relative to the loss amount.

You have him as a minimal participant in the wire fraud, right? And it is the wire fraud lose amount that is driving this. While I understand you don't have him in a mitigated role for the money laundering, but -- but what's driving -- right? We have a 20-point increase based on the loss amount.

Tell me the Government -- how does the Government view this defendant relative to the loss amount?

MR. WEINTRAUB: Yes, Your Honor. Thank you.

The reason that the 20-point enhancement applies, and I think appropriately to this defendant, is because the group of money launderers that are charged in this Indictment laundered around $18 million of victim funds.

If the defendant were being held liable for the entire amount of money that the wire fraud conspiracy that he was a member of laundered, it would be $2 billion.

THE COURT: Right.

MR. WEINTRAUB: He would be much -- he would be at Enhancement P, at 30 levels.

So while 9.5 to 25 million is a big tranche, and 9.5 is a big number, the Government actually believes that it was within the defendant's contemplation that the scheme -- the group of people that he was really facilitating or really communicating with, the group of money launderers, the other charged defendants in this case, they were moving and laundering $18 million over the course of the scheme, and so that's --

THE COURT: Did he have -- I'm just curious -- I'm just trying to understand in terms of how it worked. He was this middleman and he provided the account information, would he have had knowledge or control over the amounts at issue? Or, like, you know, like...

MR. WEINTRAUB: Yeah.

THE COURT: Is this -- as I understand it, and you'll correct me if I'm wrong, his brother was involved in this, his brother was a driver of a lot of this, and I'm curious -- so, you know, when he said -- told by his brother, because he's giving -- he's being given instructions under the wire fraud, right, he has a minimal role, go get these accounts, did he have a clear understanding as the Government views the evidence of the

amounts at issue?

MR. WEINTRAUB: I think that he had an understanding of the amounts at issue, and the text messages exchanged that he's part of -- they discuss how much the victim's on the hook for.

THE COURT: I see.

MR. WEINTRAUB: But he doesn't have control over. He's not -- he's not --

THE COURT: Right. He has knowledge, but not control.

MR. WEINTRAUB: Right.

THE COURT: Hence, minimal.

MR. WEINTRAUB: Right.

So, again, that's where I think the 9 to 25 enhancement, you know, while it is a lot, I actually think it really pails in comparison to what a different view could be, which is, let's hold him on the hook for the --

THE COURT: For everything.

MR. WEINTRAUB: -- entire wire fraud conspiracy, which would be, you know, certainly more than $550 million.

THE COURT: Fair enough.

MR. WEINTRAUB: Now, with respect to the other *3553(a)* factors, the seriousness of this crime here is not debatable. We have victim impact statements in the PSR. The Court is quite familiar with them at this point. This

is a devastating financial crime that really ruins peoples' lives. Not only financially, it shakes their ability to trust, and it can erase decades of savings, create familial strife amongst parents and children and real psychological damage.

And I think the message needs to be sent that just because a crime is being committed far away and just because you never met the person and you're just communicating over a WhatsApp or WeChat, which is a different -- another form of communication popular in the Chinese community, it doesn't absolve you. It doesn't protect you from the ramifications of your conduct here.

And a sentence -- the Government is cognisant of the fact that the Court has given many of the defendants sentences at the low end of the guidelines range and --

THE COURT: But guidelines, nonetheless, in each instance, except for Mr. Chen, I believe, but...

MR. WEINTRAUB: Well, Mr. Chen had --

THE COURT: Yes.

MR. WEINTRAUB: -- specific -- well, I think he was still given a guideline sentence, but it just wasn't at the very low end of it. But I could be wrong about that. But he had specific --

THE COURT: I think I gave him a 6 -- if my -- if the clerk -- if the chart I asked my clerk to prepare is

accurate, I give him 63 months, and he had a 53- to 61-month guidelines range.

MR. WEINTRAUB: In any event, I -- I take the chart at its word.

If the Court -- and the Government can't advocate for a specific sentence within the guidelines range --

THE COURT: Right.

MR. WEINTRAUB: -- but to avoid unwarranted sentencing disparities, a sentence in line with the Court's prior conduct -- prior sort of sentencing of co-defendants would give Mr. Zhang a sentence that's higher, or at least as high as any other defendant, and I think that's appropriate here. That's how the Government views this defendant. He is not amongst the least culpable with respect to this entire group of defendants before the Court.

I think the Court now understands what the minimal role deduction is for --

THE COURT: Yes.

MR. WEINTRAUB: -- and so the Government, again, stands on its papers that a sentence within 63 to 78 months would be appropriate.

Thank you.

THE COURT: Thank you. I appreciate that.

All right. You are up, Mr. Zone.

MR. ZONE: You know, this is why I don't sleep at

night before sentencing, because when I drill down and get to understand really what's going on with my client, I can't sleep because as -- as wonderful of a guy as the prosecutor is, I really feel honestly knowing what I know, that it's -- there's a distortion going on.

Does my client not belong -- should he not be punished? Of course he should be punished. He committed a crime. But there's so much here that the Court needs to understand.

THE COURT: Okay.

MR. ZONE: And, obviously, that's my job. And like I said to you, that's why I can't sleep, because I understand the Government's position. He's minimal, but as to a part of the case, yet --

THE COURT: As to a part of the case, that standing alone is a particularly large part of the case. I think that was critical to the points -- the point made by the Government.

But go ahead.

MR. ZONE: Yes. I -- I mean, I -- I discussed with --

THE COURT: Yes.

MR. ZONE: -- the prosecutor before we took the plea what these issues were.

THE COURT: Uh-huh.

MR. ZONE: My client is the brother of the lead defendant.

THE COURT: Yes.

MR. ZONE: Who is not just the lead defendant, he's a very special guy --

THE COURT: Uh-huh.

MR. ZONE: -- who's in -- who is in -- in Boston, specifically Rhode Island, but he's in Boston being prosecuted for a major case --

THE COURT: Yes.

MR. ZONE: -- major case of narcotics, of theft, of fraud, of bank fraud, of -- this list, I would love to cross-examine a witness like this, but more importantly, my client has an 8th grade education, and he does nails at a nail salon, and he joined his brother when his brother said, I can help you with money, and he did the things that we're going to talk about. But --

THE COURT: But there's no question, 8th grade education aside, he understood that he was engaged in illegal conduct, to garner money. So, I mean, it wasn't --

MR. ZONE: Of course.

THE COURT: Right.

So it wasn't like he didn't get it.

MR. ZONE: Oh, no, no. There's a couple things I want to say --

THE COURT: Yes.

MR. ZONE: -- please, Judge, and we -- I've been before you many, many times in other sentencings. Nothing I say here today -- and if I do misspeak, I have no intension of -- of communicating that he -- he anything but accepts responsibility for his crime and what he pled to.

So, you know, if I -- if I --

THE COURT: I wasn't -- no, and I didn't take that statement to suggest you were doing otherwise. I just wanted to make sure that our view of -- or my view of the defendant was consistent with --

MR. ZONE: Right. A guy with an 8th grade education can communicate on WeChat, okay? And by text that these are bank account numbers, and here you go, okay? And get information from his brother because he's his administrative assistant or his assistant.

He had absolutely no autonomy in this case other than getting up, brushing his teeth, and going in and doing something for his brother.

THE COURT: Hence -- hence the award of the 4-point reduction for being a minimal participant.

MR. ZONE: Minimal participant in the Cambodia fraud, in the T5 fraud.

And I can tell you right now, my conversation with my client this morning, he doesn't even know what T5 is, and

that -- he doesn't even have to know what T5 is. He doesn't have to know that that -- that's a -- that's a demonstration by the fraudsters in this case to trick the victims into thinking they made money when they didn't.

THE COURT: Right. He knew that people --

MR. ZONE: My client doesn't know T5 --

THE COURT: But it doesn't mean -- he knew that people were being tricked out of their money. You can call it -- you know, whether it goes by any other name, he knew they were being tricked out of their money. Call it T5, T25, it doesn't really matter.

MR. ZONE: He knew because it was obvious.

THE COURT: Right. Okay.

MR. ZONE: He didn't participate -- he didn't go to Cambodia like his brother -- and I can tell you right now, the lead defendant who downstream cooperated against everybody, which is, fine, it's fair, is the person who has completely designed this tremendous conspiracy.

But the one thing that my client did, and he was chosen to do, and he was paid to do -- by the way it was an $18 million fraud, my client stood to make in the vicinity of 40 to 50,000, but actually collected around 20,000. $18 million fraud over the time that he was in the case, which I can tell you, Your Honor, is he started in March of '22, and then they were all arrested in October -- or -- was

it October?

THE COURT: But he -- but the loss amount issue here, at least to the Government's point, right, the Government has narrowed it to really his participation as opposed to the overarching scheme, and so while he may have negotiated a bad deal for himself, which it sounds like he did, the loss to the victims that he -- that he participated and contributed to is in line with the loss amount here, no?

MR. ZONE: I'm sorry. I lost that.

THE COURT: It was a lot.

MR. ZONE: I lost you for one second.

THE COURT: I'm saying the loss amount -- you said he only took home $20,000 out of all of this, and I understand that. That's what he -- he gained, and that's -- you know, again, he got the minimal role adjustment for the wire fraud. But in terms of the loss amount that he would be responsible for, the Government said, Look, we've already narrowed it to a loss amount that can be tied to this individual defendant. It's already been narrowed, Judge.

We've contemplated this issue already by focusing on the range of 9.5 to 25 million. We could have taken a different approach, which would have garnered a much higher loss amount.

Did I get that right, Mr. Weintraub?

MR. WEINTRAUB: Yes.

It's -- the -- the $18 million is the amount of the group of people that are charged in this case that were operating -- I'm going to say -- use the word "under" Jin Hua Zhang and Jin Fu Zhang.

THE COURT: So his link.

MR. ZONE: Okay. So -- I understand what you're saying. I can say that my client should have known that there was a fraud going on, and that's what this money was. Like I said here, he got a minimal role for his involvement in the fraud because he didn't know, because he wasn't integral to the fraud. He had nothing to do with these people losing any money, right? He wasn't the one selling them the Brooklyn Bridge and stealing money from them.

THE COURT: Okay. You do realize the notion of saying that he was -- had nothing to do with these people losing any money is an absurdity?

MR. ZONE: He wasn't the person. So -- so the fraudsters -- he wasn't a fraudster.

THE COURT: His role was different and everybody -- look. He played his position, so --

MR. ZONE: I get that. But I'm just saying to you, the reason he got a minimal role is because he wasn't the fraudster. He was the money launderer, right? That's the point.

THE COURT: Well, he got a minimal role adjustment

because of a number of factors. I think that the way in which you've kind of boiled it down, I -- I think is inartful. I'll put it that way.

MR. ZONE: He wasn't the guy in Cambodia reaching out to the victims.

THE COURT: I get that.

MR. ZONE: That's the only point I'm making. And that's why the Government has took the position that he's a minimal participant in that piece of the case.

THE COURT: Okay.

MR. ZONE: I'm -- that's my understanding.

THE COURT: Okay.

MR. ZONE: I'm not saying at his brother's behest he didn't forward account information so the money could be sent somewhere, the stolen money could be sent somewhere. His role is crystal clear to me. But like I said to you, he had no autonomy in this case. But what's also interesting --

THE COURT: But he's gotten the minimal role adjustment.

MR. ZONE: Right.

THE COURT: I got that.

MR. ZONE: Right. But now there's another piece of this that I want -- that I want to make clear. There's also, he gets the 0-point offender. What does that mean?

It means that he's never been arrested before, but there's also a criteria, and the Government has taken the position that he is not the direct cause of these losses.

I can use that fact that's -- that's under the criteria of 0-point offender to say that the Government has conceded that he is not directly related to these losses.

So if you add up -- you'll have a chance to, you know -- but my point is, he's done what he's done. He's communicated, okay, to the fraudsters account information, where the money would come back from the people that were defrauded, okay?

This was all 100 percent at his brother's behest. He was working for his brother. His brother was telling him what to do and how to do this. So, you know, in terms of the minimal participation aspect of this, he wasn't -- he didn't know the breath and scope of this, and the only reason he --

THE COURT: But I feel like you're spending time arguing a point that you don't need to argue with me as I already sustained the Government's objection, and the Government agreed with you.

We're all in agreement, the minimal role adjustment was warranted.

MR. ZONE: But I feel like I have to jump higher and land deeper because of where the guidelines are to

demonstrate to the Court that these guidelines in total overstate his responsibility in the case.

I feel like you're talking about, look, he -- like I had said to you -- I'm saying to you, these -- these numbers, does he know how much money was transferred? Of course. The numbers, the amount of money that he's -- that's being transferred are in the WeChats, they're in the text messages, they're communicated. I'm not standing here saying he didn't know how much money. I'm not standing here saying that he didn't know where -- you know, where they were going to go, but then once the money was there, okay, his brother, okay, who said nothing to him about the crime, his brother would decide what was going to be done with the money. He would tell him --

THE COURT: But he knew the amounts that were at issue --

MR. ZONE: Coming from --

THE COURT: -- that -- that related -- that directly tie to the victims' losses. He knew, right?

So if he started off day one, and he was like, Okay, it's $10,000, that -- that -- those numbers kept growing over time. He saw it, he knew it, right? Over time, he -- he could see the numbers. There were conversations. Oh, this is 20,000 here, 15,000 here, here's grandma -- you know...

MR. ZONE: There's no --

THE COURT: So he knew.

MR. ZONE: Oh, yes.

THE COURT: And he was aware -- it's not like, for example -- and it may not be an apt analogy -- but it's not the courier who shows up and has no idea at all what's -- the amount, whatever, and just goes and they just have to strap or swallow, whatever, it's not because he knew.

MR. ZONE: And I'm not -- and I'm not making that argument, and that would be an offensive argument to make because I know --

THE COURT: Yes.

MR. ZONE: -- I know the case. I know the facts of the case. This case has been going on for 11 years. I mean, I know everything about the case. And I know because I've known this client that, you know, his brain is -- is -- is just different. He's not -- I mean, I don't mean to insult my client, but --

THE COURT: I know, but I need to -- I can only -- we -- I can only deal with what -- we'll deal with his brain in a minute. Right now I'm trying to deal with the loss-amount issue because, certainly, you are right, the loss amount is driving the guidelines range here.

The Government, by the way -- where's -- what's the table -- give me the table for the loss amount.

MR. WEINTRAUB: *2B1.1.*

THE COURT: *2B1.1.*

Okay. I just want to see what happens if I make this point.

(Pause in proceedings.)

THE COURT: 20 -- hold on a second.

(Pause in proceedings.)

THE COURT: I can't -- I don't know if I'm going to be able to make the point I'm trying to make, but give me a second.

(Pause in proceedings.)

THE COURT: One second.

(Pause in proceedings.)

THE COURT: Two, three -- I don't know. I don't know if I can do -- if I can figure this out in my head, but the Government is advocating that the Court impose a sentence consistent with the guidelines range contemplated by the parties in their plea agreement, right?

Given the way in which the guidelines calculation works out and is driven by the loss table, if I were to do that, that would necessarily mean if I'd reverse engineer this that in effect, right, if I were to do that, I would be holding him accountable for an even lesser loss.

Just -- do you understand my -- does anybody understand what I just said?

MR. ZONE: I do understand.

THE COURT: You see what I'm saying?

MR. ZONE: Yes.

THE COURT: So in a way, you've gotten it from the Government already. Somebody smarter than me could do it really quickly and reverse engineer what the Government's recommend -- not recommended sentences, they're not allowed to make a specific recommendation within the guidelines -- but the Government's urging that the Court apply the guidelines range contemplated by the plea agreement necessarily means that if I were reverse engineering it, the Government, in effect, it would be suggesting that he would be getting some dispensation on the loss amount.

MR. ZONE: Okay. So his -- in response to that --

THE COURT: Yes.

MR. ZONE: So you have this -- the brother, who we all now is the mastermind plus, right, because he's not even in this jurisdiction --

THE COURT: Yes.

MR. ZONE: -- he's somewhere else dealing with a major narcotics case plus, plus.

THE COURT: Uh-huh.

MR. ZONE: So now he's got an $18 million loss figure. And he made millions of dollars, I'm assuming. Maybe he made nothing. But I'm assuming he made

$18 million. I mean, he -- I'm assuming he made millions of dollars. My client made $20,000, right? So they have the same loss figure.

Neither -- on that aspect of the case, certainly, my client is being held to the same standard as his brother, who he's working for.

THE COURT: Not while the Government's advocating that I sentence him somewhere between 63 and whatever months.

What's the guideline range contemplated in the plea agreement?

MR. WEINTRAUB: 63 to 78.

MR. ZONE: That's just --

THE COURT: Okay.

MR. ZONE: That's just because of a -- that's just because of a -- you know -- you know, a loose mistake in terms of our plea agreement and the difference between what Probation --

THE COURT: Well, the Government, just like you are, are aware that, ultimately, the guidelines range is set by the Court. So nonetheless, the Government is advocating --

MR. ZONE: No, no. How many times did -- I'm sorry to interrupt you, Judge. I apologize.

THE COURT: Uh-huh.

Now I've lost my train of thought.

MR. ZONE: I'm sorry.

THE COURT: Uh-huh.

Go ahead.

MR. ZONE: The question is: How many times do you see people come in here with a plea agreement that differs so dramatically from Probation's calculations?

THE COURT: Too often is what I would say. It happens a lot. Probably more than you realize.

MR. ZONE: I don't know.

THE COURT: We could switch seats and you would see.

MR. ZONE: I would -- that's okay.

So my point, Judge, is we're holding my client and his -- you know, superhero criminal brother to the same financial standard. Put aside the disagreement between our plea agreement and Probation, even though, yes, I understand where the Court is saying, Look, I'm going to give you equity of the fact that you have a plea agreement --

THE COURT: But by giving -- if I give the equity -- I didn't say I would, I said the Government was asking me to -- but in any event, if I were to follow the Government's recommendation, then your argument doesn't hold because in effect, they would not be being held to the same standard because necessarily it would require me if --

again, if I reverse engineered it, effectively, he would be held liable or responsible -- culpable for a lesser loss amount, because it's the Government that said give him the minimal role adjustment.

It's not that -- that's not -- that's not what the problem is, it's the loss amount, and the Government's advocacy here suggests that if I follow suit, indeed, you've kind of -- you're getting the benefit of the *Adelson* argument.

MR. ZONE: Okay.

THE COURT: You know, I -- I don't disagree with you that the loss amount drives this --

MR. ZONE: My --

THE COURT: I don't disagree that there's a --

MR. ZONE: Yeah, my --

THE COURT: Hold on. You can do it once. You can't do it multiple times. You're going to have a bad day if you interrupt me again.

MR. ZONE: I'm sorry.

THE COURT: Okay.

As I said, in effect, the Government is agreeing with you that a special dispensation should be given by virtue of their recommendation that the Court honor the guidelines range set forth in the plea agreement.

The only way in which I could do so, obviously,

variance is downward, but if I'm trying to figure out how this fits in, I would be saying, Look, I'm going to give him some special dispensation because of the loss amount.

So I have some unfortunate news for you, folks. I have an unmoveable 1 o'clock, and I apologize. This is in part my own doing. We can come back later today or on another day.

What would you like to do?

MR. ZONE: I have to be in Nassau County this afternoon.

THE COURT: I apologize.

MR. ZONE: I'm sorry, Judge.

THE COURT: I apologize.

I -- but I have to be -- honestly, I don't -- in my estimation, this was not necessarily a bad thing, only because the guidelines calculation range that I have calculated here is far different than what was in the plea agreement. So you can have some moments to get your thoughts together and come up with an argument without interrupting me.

MR. ZONE: I'm sorry.

THE COURT: Let's schedule this for another day.

MR. ZONE: Sure.

THE COURT: All right.

Sooner rather than later.

Let me see. Hold on.

My calendar's bad. I'm sorry folk.

(Sotto voce discussion between Courtroom Deputy the Court.)

THE COURT: Okay.

We're going to do this, folks, the week of March 23rd, Tuesday.

THE COURTROOM DEPUTY: Sure.

THE COURT: Tuesday, 11 o'clock, folks? Is that --

THE COURTROOM DEPUTY: That would be the 24th.

MR. WEINTRAUB: The 24th.

THE COURT: The 24th.

Does that work --

MR. WEINTRAUB: Sure.

THE COURT: -- for you all?

MR. WEINTRAUB: Yes, Your Honor.

THE COURT: Thank you.

MR. WEINTRAUB: March 24th?

THE COURT: Yes.

Listen, we've gotten through most of this. I'm going to give you another opportunity to take another bite at the apple against the backdrop of everything that you've heard today so that you can formulate an argument that addresses my concerns.

MR. ZONE: I appreciate it, Judge.

THE COURT: All right?

MR. WEINTRAUB: All right. Thank you, Judge.

THE COURT: All right. Thank you, all.

We're adjourned. I'll see you on the 24th of March.

MR. ZONE: Thank you, Your Honor.

THE COURT: Thank you.

(Matter adjourned to Tuesday, March 24, 2026 at 11:00 a.m.)

--ooOoo--

I (we) certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ David R. Roy 16th Day of March, 2026
DAVID R. ROY Date